UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
|  | : | MDL NO. 1657 |
| IN RE: VIOXX | : |  |
|     PRODUCTS LIABILITY LITIGATION | : | SECTION: L |
|  | : |  |
|  | : | JUDGE FALLON |
|  | : | MAG. JUDGE KNOWLES |
| .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. | : |  |

**THIS DOCUMENT RELATES TO ALL CASES**

## ORDER & REASONS

Before the Court is Robert Shelist's Motion seeking leave of Court to file his fee petition after the deadline set by this Court and requesting that the Court waive the requirement that he submit this time through Phil Garrett's cost management system. R. 65511. The Fee Committee has responded to the motion. R. 65519. The Court has reviewed the parties' motions and consolidated the statements at oral argument, as well as the applicable law, and now issues this Order and Reasons.

**I.     BACKGROUND**

To put this matter in perspective, a brief overview of this litigation is appropriate. This multidistrict litigation ("MDL") involves the prescription drug Vioxx, known generically as Rofecoxib. Merck, a New Jersey corporation, researched, designed, manufactured, marketed, and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. On May 20, 1999, the Food and Drug

Administration ("FDA") approved Vioxx for sale in the United States. Vioxx remained publicly available until September 30, 2004, when Merck withdrew it from the market after data from a clinical trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarctions (heart attacks) and ischemic strokes. Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims. It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999, and September 30, 2004. Based on this estimate, it was thought that approximately 20 million patients have taken Vioxx in the United States.

On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("JPML") conferred MDL status on Vioxx lawsuits filed in federal court and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.,* 360 F. Supp. 2d 1352 (J.P.M.L. 2005). One month later, on March 18, 2005, this Court held the first status conference in the Vioxx MDL to consider strategies for moving forward with the proceedings. Shortly thereafter, the Court appointed a Plaintiffs' Steering Committee ("PSC") and Defendant's Steering Committee to represent the parties and to meet with the Court once every month or two to review the status of the litigation.

California was the first state to institute a consolidated state court proceeding on October 30, 2002. New Jersey and Texas soon followed suit. On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("MDL") conferred MDL status on Vioxx lawsuits filed in various federal courts throughout the country and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407. Additionally, a number of state and local governments filed suits against Merck seeking to recover amounts paid

for Vioxx prescriptions on behalf of their citizens or civil penalties pursuant to state consumer protection statutes. Soon after these "government action" cases were filed, they were promptly removed to the appropriate federal district courts by Merck, where they remained briefly before being transferred to this Court by the Judicial Panel on Multidistrict Litigation. Of these "government action" cases, only those brought by Mississippi, Alaska, Montana, and Utah remain, the others having previously settled or been remanded.

Following six "bellwether" trials in this proceeding—as well as trials in other proceedings in Alabama, California, Illinois, Florida, New Jersey, and Texas—the negotiating plaintiffs' counsel ("NPC") and Merck's counsel engaged in protracted settlement discussions over the course of a year, conducting hundreds of in-person and telephone meetings. On November 9, 2007, the parties announced a $4.85 billion master settlement agreement ("MSA") that intended to—and actually did—resolve most Vioxx-related claims through a resolution program. In its recitals, the MSA expressly states that its purpose was to "establish a pre-funded, structured private settlement program . . . to resolve . . . claims against Merck involving heart attacks, ischemic strokes and sudden cardiac deaths."

Despite the reaching a Master Settlement Agreement, there were still some outstanding aspects of the litigation. On August 2, 2005, the PSC had filed a Purchase Claims Master Class Action Complaint ("Purchase Claims Complaint"), naming individual consumers who purchased Vioxx for themselves. (Rec. Doc. 790). The Purchase Claims Complaint sought relief under a myriad of laws, including state consumer protection statutes. (*Id.* at 60-75).

After substantial settlement negotiations spanning several years, the parties reached a compromise in 2012. The proposed Settlement allocates up to $23 million, from which Class Members may seek recovery for their out-of-pocket costs for purchasing Vioxx and up to $75.00

in connection with post-withdrawal medical consultation related to Vioxx use or in lieu thereof a one-time payment of $50.00 with proof of a Vioxx prescription. Those amounts, however, were subject to a *pro rata* reduction if all claims, administrative, attorneys' fees, and other costs exceed the $23 million cap. Claims were accepted until May 6, 2014. At this stage in the litigation, Plaintiffs agree that Merck has met all of its obligations under the agreement and all claimants have been paid. The one outstanding issue is attorney fees.

According to the settlement agreement, counsel for the settlement class were entitled to seek fees for the work done on behalf of consumer class payments. These fees were to be determined by the Court based on the time and efforts of Plaintiff's counsel but were "not to exceed 32% of the maximum of up to $23 million in settlement payments." R. 64784, Section 14.1. On September 23, 2015, the Court issued PTO 59, which appointed the Common Benefit Fee and Cost Committee ("Fee Committee"). The Fee Committee was tasked with reviewing time and expense applications from twelve applicants, and has met and reviewed those applications. On January 3, 2017, the Fee Committee unanimously recommended "that the entire amount of the common fund, less expenses reimbursed by the Court, be made available for the award of attorneys' fees. In reaching this decision, the Fee Committee considered the "entire history" of the Consumer Claims, including the years involved, the complexity of the issue, the risks and efforts undertaken by counsel, and the number of claimants involved. After reaching this agreement, the Fee Committee filed a Motion seeking a Court Order setting attorneys' fees at the maximum amount allowed under the Settlement Agreement. Because the Court previously disbursed expenses in the amount of $185,580.91, the Fee Committee seeks a fee award of $7,174,419.09. R. 65491 at 4. The Court heard oral argument on that Motion on March 15, 2017.

Mr. Shelist's Motion is tangentially related to the Fee Committee's Motion, as Mr. Shelist seeks leave of Court to file his fee petition after the established deadline. In addition, he requests the Court waive the requirement that he submit this time through Phil Garrett's cost management system, as he does not have the technological capabilities to comply with that system. The Fee Committee responded to the Motion.

## II.   PRESENT MOTIONS

### a.   Robert Shelist's Motion for Leave to File Fee Petition [R. 65511]

Robert Shelist has filed a Motion seeking attorney's fees in the Vioxx MDL consumer class settlement. R. 65511. According to Mr. Shelist, he represented five individual plaintiffs in this litigation. R. 65511 at 1. In connection with this representation, he submitted a fee petition to the Fee Committee on March 1, 2016. R. 65511 at 2. After the Committee reviewed the petition, Lenny Davis informed him his fee petition was untimely, and thus he would need Court approval before the Committee could consider his petition. R. 65511 at 3. Mr. Shelist explains that he attempted to submit his time via Phil Garrett's cost management system, but was unable to do so because he does not have the technological capability to comply with the system. R. 65511 at 3.

Further, Mr. Shelist explains that he completed substantial research in the Vioxx case, and repeatedly asked for Common Benefit work, but was never afforded that opportunity. Nonetheless, he avers he is entitled to seek attorney's fees in this matter. Accordingly, he seeks leave of Court to file his Fee Petition after the deadline, and without complying with the Court's requirement that he submit the time through Mr. Garrett's Case Cost Management System. R. 65511 at 3-4.

### b. Fee Committee's Response [R. 65519]

The Fee Committee responds, largely to explain the Fee Committee's role in this litigation. The response explains that in PTO 6, the Court set forth the standards and procedures to be used when seeking reimbursement for fees or expenses. R. 65519 at 1. This required any time to be submitted to the Court-appointed CPA, Phil Garrett, via the cost management system. R. 65519 at 2. After the time was submitted, Mr. Garrett reviewed the records, and frequently met with the firms which submitted time as well as the Court to review these records. R. 65519 at 2. In accordance with PTO 59, any attorney seeking compensation in relation to the consumer class settlement was required to do so by a specific deadline in order to ensure Mr. Garrett had sufficient time to review these fee petitions. R. 65519 at 2. The fee committee suggests that Mr. Shelist's law firm failed to comply with PTO 6 and PTO 59, and now seeks leave of Court to submit this belated fee petition. R. 65519 at 3.

According to the Fee Committee, Mr. Shelist wrote Plaintiffs' Liaison Counsel on June 6, 2013, and informed them that he had "reviewed every single document that has been filed in the entire history of the MDL." R. 65519 at 3. However, the Fee Committee contends that Mr. Shelist's request for submitting time is "woefully delinquent." R. 65519 at 3. All of his proposed time submissions are for reviewing documents in the MDL, and he did not spend any time preparing pleadings or discovery, case assessment, or trial preparation. R. 65519 at 3.

Further, the Fee Committee avers that Shelist was instructed to address any questions regarding time or expenses with Mr. Garrett, and failed to do so. R. 65519 at 4. On September 25, 2015, Mr. Shelist requested a copy of PTO 6, and the Fee Committee directed him to where he could get the Order on the Court's website. Thus, he was aware of the requirements for submitting time and expense reports. R. 65519 at 4. The Fee Committee avers it did not receive

any information regarding Mr. Shelist's expenses until March 14, 2016, at which point the Fee Committee explained this information had never been received by Mr. Garrett.

As a result, the Fee Committee argues that Mr. Shelists's motion should be denied. R. 65519 at 5. In the alternative, the Committee suggests that if the Court does allow Mr. Shelist to seek common benefit fees or costs after the deadline, he must do so in compliance with PTO 6 and 59. R. 65519 at 5. Further, they aver that any additional costs Mr. Garrett incurs in relation to such late filings should be paid by Mr. Shelist.

### III.  DISCUSSION

Mr. Shelist is essentially requesting an exemption from the detailed process that the Court established to monitor attorney fees in the Vioxx MDL. Before addressing the merits of his argument, the Court finds it helpful to review the process the Court established to determine common benefit fee awards related to the consumer class in this case.

On September 23, 2015, the Court issued Pretrial Order No. 59, which emphasized it was important to "creat[e] a structure, establish[] guidelines and set[] a timetable" for attorneys' fees related to the consumer class settlement. R. Doc. 65267 at 1. In establishing the procedure to determine fees related to the consumer class settlement, the Court followed largely the same system it implemented earlier in the MDL for common benefit fees. R. Doc. 65267 at 2. To be eligible for common benefit fees, attorneys were required to submit their time and a description of the common benefit work to the Court-appointed CPA, Phil Garrett. Mr. Garret and his team, including paralegals, reviewed this time and work, and met monthly with the Court to ensure the time records were fair and accurate. Because the procedure was effective and efficient in determining the ultimate award of common benefit fees in the personal injury portion of the

7

Vioxx MDL, the Court employed the same procedure for fees in relation to the consumer class settlement. *See In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d 640, 659 (E.D. La. 2010).

However, when PTO 59 was issued in September 2015, the Court was aware only a few law firms had submitted time and/or expenses in relation to the consumer class. R. Doc. 65267. Thus, the Court instructed all counsel seeking compensation related to the consumer class claims review their time in Phil Garrett's Case Cost Management System and submit any updated records or requests by October 15, 2015. R. Doc. 65267 at 4-6. After receiving these submissions, Mr. Garrett would review the submissions and notify all the Fee Applicants whether their submissions had been rejected for any reason by November 15, 2015. Finally, on December 4, 2015, the final corrected submissions of the Fee Applicants would be posted on Mr. Garrett's Cost Management System. R. Doc. 65267 at 6. The Court warned that failing to comply with this procedure could result in sanctions, including the denial of a fee award. R. Doc. 65267 at 6.[1]

Mr. Shelist submitted his firm's first fee petition to the Fee Committee, not Phil Garrett, on March 14, 2016. R. Doc. 65511-2 at 1. This was two months after the deadline established by the Court and some ten years are the commencement of this MDL. Despite the fact that the Court explained time submissions should be entered and reviewed through Phil Garrett's cost management system, Mr. Shelist did not review his time on this system, or inform Liaison Counsel he had questions regarding whether his time submission had been accepted by the CPA. According to the records submitted to the Court, Liaison Counsel contacted Mr. Shelist on March 17, 2016, asking for additional information regarding his belated fee petition. Mr. Shelist indicates that his next response was on January 23, 2017, asking if he would be receiving

---

[1] The deadline for submitting fee affidavits was later extended to January 15, 2016.

attorney fees in this case. R. Doc. 65511-2 at 1-6. Mr. Shelist has not provided any explanation for the substantial delay in both originally submitting and then reviewing his time submission.

Additionally, Mr. Shelist requested that he be allowed to submit his belated fee request directly to the Fee Committee rather than through the Court-appointed CPA. R. Doc. 65511 at 3. The only justification Mr. Shelist provides for not following the procedure outlined in PTO 59 is his firm's technical limitations. The Court finds this is an insufficient basis to accept a belated fee submission that does not comply with the Court's procedure for fee and expense submissions. This procedure was created to ensure a meaningful process for evaluating and accepting attorney time. Submitting contemporaneous time records through a neutral CPA ensures the time is accurate, and posting the time on the case management system allows attorneys to address any concerns they may have with their time submission long before the Court begins to allocate the ultimate fee award. This procedure helps to ensure reported hours are recorded contemporaneously and not reconstructed. The process is not only helpful to the Court and the attorneys involved in the litigation, but required under Fifth Circuit law. *See In re High Sulfur Content Gasoline Prod. Liab. Litig.*, 517 F.3d 220, 228 (5th Cir. 2008) (overturning a fee award, among other reasons, when the Court did not base its decision on reliable data and a complete record of attorney time).

Furthermore, nearly every single one of Mr. Shelist's time entries were for reviewing documents, such as Court orders and minute entries, related to the Vioxx case. For example, in one week in October 2007, Shelist spent nearly two hours reviewing plaintiff profile forms for clients he did not represent, reviewing deposition notices for depositions he was not involved in and minute entries for hearings and telephone calls in which he did not participate. Shelist also seeks compensation for time he spent reviewing orders granting parties leave to file motions in

9

the MDL and orders entering correspondence into the record—despite the fact he was not directly involved in any of these matters. As the Court has explained before:

> In a case of this kind, not all types of work are created equal. Hours spent taking depositions, participating in hearings, or trials, actively participating in developing the appropriate litigation strategies and tactics (through moot court presentations or similar practices), drafting briefs, actively participating in Court conferences, arguing motions, negotiating with opposing counsel to reach a settlement, and actively managing and organizing the administrative aspects of the case are some of the more significant types of work that a case of this sort requires and deserves the most recognition. This, of course, is not the only type of work that such a case requires. Documents must be reviewed, categorized, and analyzed; e-mails must be read and responded to; claimants must be kept advised; meetings must be attended and in general the litigation must be monitored. This work, while necessary and often time consuming does not deserve equal treatment when allotting fees.

*Murphy Oil*, 582 F. Supp. 2d at 810-11. In short, there is a hierarchy of value for work that tends to have a greater impact on the litigation and generates more "common benefit." Mr. Shelist's time submissions do not demonstrate he contributed to the common benefit of the consumer class Plaintiffs in this case.

## IV. CONCLUSION

Because the Court finds that Mr. Shelist has not provided an adequate explanation for his delay in filing his fee submission, or sufficient justification for why he should be excused from filing his time in the system created and monitored by the Court-appointed CPA, Mr. Shelists Motion for Leave to File Fee Petition Instanter, R. Doc. 65511, is **DENIED**.

New Orleans, Louisiana, this 23rd day of June, 2017.

UNITED STATES DISTRICT COURT JUDGE