# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | : | **MDL NO. 1657** |
| **IN RE: VIOXX** | : | |
|     **PRODUCTS LIABILITY LITIGATION** | : | **SECTION:  L** |
| | : | |
| | : | **JUDGE FALLON** |
| | : | |
| | : | **MAG. JUDGE KNOWLES** |
| | : | |
| .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. | : | |

**THIS DOCUMENT RELATES TO ALL CASES**

## ORDER & REASONS

Currently pending before this Court is the Common Benefit Fee and Cost Committee's ("Fee Committee") Aggregate Fee Petition pursuant to pretrial order 59(A). R. Doc. 65491. Having previously resolved the issue of reimbursement of expenses,[1] the Court now turns its attention to a determination of the appropriate amount for the consumer common benefit fee for the attorneys who performed common benefit services for the Consumer Class portion of this litigation.

In addressing this issue, the Court has considered the Fee Committee's Motion, the sole objection, as well as the statements made during the March 15, 2017, hearing on this issue. Furthermore, the Court has also reviewed written memoranda and supporting documentation provided by the parties, including numerous affidavits and declarations from Fee Committee members and the Court-appointed CPA who kept track of the time and expenses attorneys spent pursuing Consumer Class claims. Lastly, the Court has examined the procedural record and

---

[1] On August 3, 2016, the Court issued an Order issuing a disbursement of all held costs to the law firms who submitted expense reports in relation to Consumer Class claims. R. Doc. 65422.

applied its own knowledge of the case accumulated through its active involvement in this litigation since its inception more than twelve years ago. Accordingly, the Court is fully advised of the matter and is now ready to rule.

## I.     BACKGROUND

To put this matter in perspective, a brief overview of this litigation is appropriate. This multidistrict litigation ("MDL") involves the prescription drug Vioxx, known generically as Rofecoxib. Merck, a New Jersey corporation, researched, designed, manufactured, marketed, and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. On May 20, 1999, the Food and Drug Administration ("FDA") approved Vioxx for sale in the United States. Vioxx remained publicly available until September 30, 2004, when Merck withdrew it from the market after data from a clinical trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarctions (heart attacks) and ischemic strokes. Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims. It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999, and September 30, 2004. Based on this estimate, it was thought that approximately 20 million patients have taken Vioxx in the United States.

On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("JPML") conferred MDL status on Vioxx lawsuits filed in federal court and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.,* 360 F. Supp. 2d 1352 (J.P.M.L. 2005). One month later, on March 18, 2005, this Court held the first status conference in the Vioxx MDL to consider strategies for

moving forward with the proceedings. Shortly thereafter, the Court appointed a Plaintiffs' Steering Committee ("PSC") and Defendant's Steering Committee to represent the parties and to meet with the Court once every month to review the status of the litigation.

Suits were filed in various state courts. Some were removed to federal court and transferred to this Court. Others remained in state court due to lack of diversity. California was the first state to institute a consolidated state court proceeding on October 30, 2002. New Jersey and Texas soon followed suit. This Court coordinated the MDL proceeding with these state courts and worked closely with the state judges. Additionally, a number of state and local governments filed suits against Merck seeking to recover amounts paid for Vioxx prescriptions on behalf of their citizens or civil penalties pursuant to state consumer protection statutes. Soon after these "government action" cases were filed, they were promptly removed to the appropriate federal district courts by Merck, where they remained briefly before being transferred to this Court by the Judicial Panel on Multidistrict Litigation.

Following six "bellwether" trials in this proceeding—as well as trials in state court proceedings in Alabama, California, Illinois, Florida, New Jersey, and Texas—the negotiating plaintiffs' counsel ("NPC") and Merck's counsel engaged in protracted settlement discussions over the course of a year, conducting hundreds of in-person and telephone meetings. On November 9, 2007, two years after the commencement of the MDL proceeding, the parties announced a $4.85 billion master settlement agreement ("MSA") that intended to—and actually did—resolve most Vioxx-related personal injury claims through a resolution program. In its recitals, the MSA expressly states that its purpose was to "establish a pre-funded, structured private "opt-in" settlement program . . . to resolve . . . claims against Merck involving heart attacks, ischemic strokes and sudden cardiac deaths."

Having settled a large majority of the personal injury cases within this MDL, the Court turned its attention to government actions suits filed against Merck.  Several government entities had pending litigation in this MDL, including suits brought on behalf of various states, including but not limited to Alaska, Colorado, Florida, Louisiana, Mississippi, Montana, Pennsylvania, Utah, Oklahoma, and South Carolina.  These suits sought damages for monies paid by the state for Vioxx, through the state's Medicaid program. These suits were based around similar claims, namely that each respective state would not have approved payment for Vioxx, through their Medicaid programs, had they known of its cardiovascular risks. After one bellwether trial, the vast majority of these "government action" cases were either settled or remanded.

Finally, the Court was able to turn its attention to the consumer claims. On August 2, 2005, the PSC had filed a Purchase Claims Master Class Action Complaint ("Purchase Claims Complaint"), naming individual consumers who purchased Vioxx for themselves. R. Doc. 790. The Purchase Claims Complaint sought relief under a myriad of laws, including state consumer protection statutes. *Id.* at 60-75. Plaintiffs in the Purchase Claims complaint took Vioxx, but did not suffer any ill effects from the drug and, therefore, did not qualify for participation in the opt-in settlement program. Nonetheless, Class Members sought recovery for a return of the purchase price of the drug, as well as any medical expenses that were directly related to their Vioxx prescription. Class Members argued that even though they were not injured, had they known about the negative side effects, they would never have purchased Vioxx.

After substantial settlement negotiations spanning several years, the parties reached a compromise regarding the Consumer Class claims in 2012. The proposed Settlement allocates a common benefit fund of up to $23 million, from which Class Members may seek recovery for their total out-of-pocket provable costs for purchasing Vioxx and up to $75.00 in connection

4

with post-withdrawal medical consultation related to Vioxx use or in lieu thereof a one-time payment of $50.00 with proof of a Vioxx prescription. Those amounts, however, were subject to a *pro rata* reduction if all claims, administrative, attorneys' fees, and other costs exceed the $23 million cap.

The Settlement Agreement called for the establishment of a settlement website, toll-free phone number, and post office box to serve as sites where Class Members could obtain or request detailed Notice. Settlement Agreement ¶¶ 5.3–5.5; R. Doc. 64487 at 10. Moreover, Kinsella Media, LLC ("Kinsella") developed a Notice plan to alert the class to the settlement. This plan called for a direct mailing to all counsel for the putative consumer class, paid media advertising, including a mix of print, broadcast, and online media, and a comprehensive online media campaign. R. Doc. 64502–3 ¶¶ 16–29 Kinsella and BrownGreer worked together to implement the Notice plan. R. Doc. 64526.

Despite Herculean efforts, the number of filed claims remained low, with only 3,137 claims filed by February 16, 2014 for an average of 131 claims filed per week. To boost the number of filed claims, at the suggestion of the Court, the parties authorized BrownGreer to implement a Courtesy Reminder Campaign on February 12, 2014. Pursuant to this campaign, BrownGreer reached out again to those claimants who had indicated that they could be potential consumer claimants. These efforts included direct mailings to claimants; emails to law firms who represented claimants; emails to claimants who had started the electronic form but had failed to complete the form; emails to claimants who had registered for Secure Claims Portal access but had not started a Claim Form; and direct mailing to claimants who had requested and were sent a hard copy of the form but had not completed a Claim Form. Moreover, BrownGreer enhanced the call center by offering live operator call-backs, Spanish recorded messages, and Spanish-

speaking representatives. Finally, BrownGreer augmented the website capabilities by including a Claim Form on the home page, including a mailed Claim Form request; adding new language to the homepage; adding a "Do I Qualify for Payment" feature, which would ask potential claimants pointed questions to determine their eligibility; and finally, including a Spanish Claim Form and offering a Spanish version of the website.

These efforts were largely successful. The average number of claims per week increased from 131 per week to 312 per week. By the time the claims period concluded on May 6, 2014, a total of 8,757 claims had been filed, with 5,620 claims having been filed after the implementation of the Courtesy Reminder Campaign.

Of the 8,757 claims filed, BrownGreer deemed 2,284 claims to be ineligible. These determinations broke down as follows: 308 claimants provided no documents; 238 claimants included invalid documents; 314 claimants submitted an incomplete claim form, 916 were determined ineligible for multiple reasons; 110 were excluded; and 398 were found to be duplicates—they had filed more than one claim form. During Orran Brown, Sr.'s presentation to the Court on December 16, 2014, Mr. Brown explained that most of those determined "excluded" had either signed a release form in the Vioxx Personal Injury Settlement or were Missouri residents and therefore excluded from the Consumer Class by agreement of the parties.

In an effort to cure the ineligible claimant's problematic documentation and forms, BrownGreer issued a notice to those claimants. The notices took the form of email if the claimant had filed electronically and paper notice if the claimant had submitted a hard copy claim. The notices instructed the ineligible claimants to submit the missing documentation and/or forms within thirty days and included an email and toll free number to contact if the ineligible claimants had questions.

BrownGreer issued the first notice on August 22, 2014 and received 690 responses, a 29% response rate, of which 83% of those responses cured their problematic claims. The second notice went out on October 23, 2014, and BrownGreer received 344 responses constituting a 20% response rate. Eighty-four percent of those responses cured their ineligible claims.

The final period to cure any deficient claims has closed. As reported by BrownGreer, there are 7,366 payable claims, 988 ineligible claims, and 403 duplicate claims. The final number of claims total 8,757. At this stage in the litigation, Plaintiffs agree that Merck has met all of its obligations under the agreement and all claimants have been paid. Consumer Class counsel spent $1,667,140.09 on Kinsella Media Notice Costs, $1,552,595.62 on claims administration fees and expenses. Law firms who worked on the Consumer Class claims were reimbursed $185,580.91 for expenses. The total amount paid to eligible claimants was $698,767.22. It is now appropriate to determine a fair fee for the attorneys who performed common benefit work.

Section 14 of the Settlement sets forth fees and expenses of Class Counsel and other counsel for the consumer class settlement.  R. Doc. 64501-3 at 21-22.  Pursuant to that section,

> Counsel for the Settlement Class, and any other counsel with a basis to seek the payment of fees and litigation expenses incurred in connection with the litigation of the consumer claims and related putative consumer class action cases involving Vioxx, may apply to the Court for an award of fees and expenses to be paid from the Common Fund in a total aggregate amount for all such counsel not to exceed 32% of the maximum of up to $23 million Settlement Amount (or an aggregate maximum amount of up to $7,360,000) . . . . The actual award of fees and litigation expenses to Class Counsel or to any other counsel shall be made by the Court following an open and transparent process, including a hearing before the Court open to the public and all Class Members.

R. Doc. 64501-3 at 21-22.

On September 23, 2015, the Court issued PTO 59, which appointed the Common Benefit Fee and Cost Committee ("Fee Committee"), consisting of attorneys who worked on this aspect

of the litigation—some of whom were on the PSC and some who were not—and established guidelines for common benefit attorney fees and cost reimbursement. The Fee Committee was tasked with reviewing time and expense applications from any attorney seeking costs or fees in connection with the Consumer Class claims. Attorneys seeking fees in this matter were instructed to submit a Fee Affidavit to Phil Garrett's Case Cost Management System. Twelve such affidavits were submitted. These twelve applicants appeared before members of the Fee Committee and provided an explanation of their requested fees and expenses, as well as how their efforts contributed to the common benefit of the Consumer Class.

On January 3, 2017, the Fee Committee unanimously recommended "that the entire amount of the common fund, less expenses reimbursed by the Court, be made available for the award of attorneys' fees. In reaching this decision, the Fee Committee considered the "entire history" of the Consumer Claims, including the years engaged, the complexity of the issue, the risks and efforts undertaken by counsel, and the number of claimants involved. After reaching this agreement, the Fee Committee filed a Motion seeking a Court Order setting attorneys' fees at the maximum amount allowed under the Settlement Agreement. Because the Court previously disbursed expenses in the amount of $185,580.91, the Fee Committee seeks a fee award of $7,174,419.09. R. 65491 at 4. The Court heard oral argument on that Motion on March 15, 2017.

## II.     Fee Committee's Memorandum in Support of Aggregate Fee Petition Pursuant to Pre-Trial Order 59(A) (R. Doc. 65491)

The Fee Committee avers that the requested fee is appropriate because the percentage method is the superior method for determining attorney fees in common fund cases, the award percentage in this case should be based on the entire settlement amount, and the particular facts of this complex class litigation case support the requested award. R. Doc. 65491-1 at 4. Further,

8

the Fee Committee argues that the requested fee is fair and reasonable based on both the lodestar cross-check and the *Johnson* factors. R. Doc. 65491-1 at 14.

The Fee Committee explains that common fund cases are an exception to the American Rule, and when awarding fees in common fund cases, courts typically apply the percentage method, where courts award fees as a reasonable percentage of the common fund. R. 65491 at 5; citing *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642-43 (5th Cir. 2012). The Committee explains that "[w]hen conducting a percentage of the fund analysis, courts must calculate the ratio between attorney's fees and benefits to the class." R. 65491 at 6 (quoting *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 282 (6th Cir. 2016)). Here, the Fee Committee contends that the fee award should be calculated as a percentage of the total maximum available settlement amount, $23 million, as the "benefits to the class" should be determined by the maximum amount of benefit Plaintiffs were entitled to receive, and not limited to a percentage of only the actual funds paid to claimants. R. 65491 at 6.

For example, the Fee Committee cites *Boeing Co. v. Van Gemert*, where the United States Supreme Court upheld the district court's decision to award attorneys' fees based on a percentage of the total amount of the class action settlement fund—including unclaimed portions of that award. 444 U.S. 472, 480 (1980). In so holding, the Court explained that *all* class members had received a benefit as a result of the attorneys' efforts, and whether or not they chose to exercise that benefit should not limit the attorneys' compensation. *Id*. Thus, the Fee Committee argues that under *Boeing* and its progeny, the award in this case should also be based on the entire amount of the Settlement Fund, rather than only those funds actually claimed. R. 65491 at 7-11.[2]

---

[2] The Fee Committee cites to cases from other circuit courts which have applied the rule in *Boeing* and reached the same result. *See Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437

While the Fee Committee recognizes that the Fifth Circuit reached a different result in

*Strong v. BellSouth Telecomm., Inc*., they argue that *Strong* is in applicable in this case. R. 65491

at 7; citing 137 F.3d 844 (5th Cir. 1998). The Committee explains:

> "In *Strong*, class counsel had already been awarded more than the full lodestar
> value of their services and were seeking to apply a multiplier. The Fifth Circuit
> concluded that the District Court did not abuse its discretion by focusing on the
> $1.5 million of benefits actually distributed to the class rather than the $64 million
> estimated value of the settlement fund that included coupon-like benefits. *Id*. at
> 851-53. Despite acknowledging that in *Boeing*, supra, the Supreme Court had
> upheld the District Court's decision to consider the potential awards available rather
> than the actual claims made, the Fifth Circuit distinguished *Boeing* because there
> each member had an "ascertainable claim to part of [the] lump-sum judgment" that
> could be accessed "simply by proving their individual claims," whereas in *Strong*
> the agreement did not establish a fund and included the difficult-to-access
> "phantom" benefits rather than cash." *Id*. Thus, far from creating a categorical rule
> requiring courts to consider only the benefits actually distributed, *Strong* expressly
> noted that, unlike here, fees had already been awarded under the lodestar method
> and explained that "this course of action is not the usual one" and "under the
> atypical circumstances of this case, the district court did not abuse its discretion in
> considering the actual results of the settlement." *Id*. at 853.

R. 65491 at 7. Thus, the Committee argues that this Court should follow the rule in *Boeing*,

rather than the "outlier" rule in *Strong*. R. 65491 at 10.

Second, the Fee Committee argues that the specific facts and circumstances of this case

support an award based on the entire settlement amount, rather than only the amounts paid. R.

65491 at 11. Specifically, they argue this case "represented a nationwide settlement of hundreds

of actions," and reaching a resolution in this matter took diligent work, innovative methods, and

creative problem solving. Furthermore, claimants sought to recover pursuant to various state

consumer protection statutes; in eighteen of the involved states, the consumer protection statute

---

(2d Cir. 2007) (holding that district court abused its discretion in calculating fees strictly based on the
dollar amount paid to approved claimants); *Waters v. Int'l Precious Metals Corp*., 190 F.3d 1291, 1295
(11th Cir. 1999) (awarding 30% of settlement fund, rather than 30% of funds paid as attorney fees);
*Williams v. MGM – Pathe Communs. Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (reversing district court's
decision to award attorneys' one-third of money claimed from settlement, rather than one-third of the
entire settlement amount).

provides that a prevailing plaintiff is entitled to an award of costs and fees, "while virtually all of the remaining jurisdictions permit such an award." R. 65491 at 11. Thus, they contend that calculating attorney fees based on a percentage of the maximum settlement amount is consistent with the statutory remedies for this type of case.

Further, the Committee argues that public policy supports the Fee Committee's requested award. They contend that if fee awards in consumer claims litigation are only based on the dollar amount paid to claimants, "the remedial goal of the [consumer protection] statutes will be thwarted," as attorneys will not be willing or able to handle these cases. R. 65491 at 12; citing *Alexander v. S&M Motors, Inc.*, 28 S.W. 3d 303, 305 (Ky. 2000) (citation omitted); *see also Jones v. Gen. Motors Corp., supra*, at 1109 (noting that public policy demands that attorneys be fully compensated in order to encourage them to bring cases under statutes designed to protect the public). Further, the Fee Committee contends that Fee Applicants should not be punished because fewer individuals filed consumer claims that initially anticipated, particularly in light of the fact that this portion of the MDL was not resolved until ten years after Vioxx was withdrawn from the market. R. 65491 at 13.

Finally, the Fee Committee argues that the requested fee in this case is reasonable and fair, and the lodestar cross-check and *Johnson* factors support such an award. R. 65491 at 14. The Committee claims that the Fee applicants have spent nearly 18,000 hours working on the consumer claims, and in many cases, small to mid-sized law firms expended considerable time and expense in order to pursue claims against a large multi-national corporation. R. 65491 at 15-16, *see* ex. B-M. Applying an average billing rate of $443.29 an hour for this time leads to an award in excess of $7,900,000. Further, the Fee Committee explains this litigation presented novel and difficult issues, particularly in light of the "sheer magnitude of the Vioxx litigation."

R. 65491 at 16. While it agrees this case was not undesirable, the Committee argues the large consumer award was a direct result of the "substantial skill and ability" of the Fee Applicants. R. 65491 at 16-17. The Committee contends the Fee Applicants "took on considerable risks," and "contributed to a favorable and meaningful global resolution of complex nationwide consumer claims against Merck." The Committee explains that courts "routinely" award attorney fees between 10% and 50% of the common fund amount, and therefore the award of 32% in this case is in line with awards in similar cases. R. 65491 at 18-19.[3] The Committee avers that this would represent a negative multiplier to the lodestar cross-check, which "provides strong support for approving the attorneys' fee request." R. 65491 at 15. Thus, the Committee argues, the award should be calculated based on the total benefit to consumers—the 23 million dollar settlement fund—and an award of 32% of that fund is reasonable under the *Johnson* factors and the lodestar cross-check. R. 65491 at 20.

### III.   Notice of Objection to Motion for Attorney's Fees [R. 65497]

The sole objection[4] to the Fee Committee's Motion comes from a pro se consumer, Geneva Meloy, who is a member of the subject class. R. 65497 at 1. He objects to the fee proposal because he cannot verify the reasonableness of the lodestar because the fee declarations are sealed, and believes the Fee Applicants are requesting fees for "duplication of effort and unnecessary work."

---

[3] *See, e.g., In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993) (18% of $170 million); *In re Combustion*, 968 F. Supp. 1116 (W.D. La. 1997) (36% of $127 million); *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403 (S.D. Tex. 1999) (25% of more than $190 million); *In re Bayou Sorrel, supra,* at *12 (36% of gross recovery). The average 33% recovery remains true outside of the Fifth Circuit as well. *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 460 (9th Cir. 2000) (affirming award of fees equal to one-third of total recovery); *Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, 2009 U.S. Dist. LEXIS 27899, at *16-17 (S.D.N.Y. Mar. 31, 2009) (holding that "Class Counsel's request for 33% of the Settlement Fund is typical in class action settlements in the Second Circuit" and collecting cases); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 150 (E.D. Pa. 2000) (an "award of one-third of the fund for attorneys' fees is consistent with fee awards" by district courts in the Third Circuit).
[4] Merck previously filed an objection, R. 65503, but on March 7, 2017, filed a Motion to Withdraw their objection.

R. 65497 at 1. In addition, he argues that extraordinary effort was not required because the primary personal injury MDL had already settled, and the low claims rate justifies a lower fee than requested. R. 65497 at 2.

## IV.    DISCUSSION

### A.    Procedure

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). First, "[a] claim for an award must be made by motion under Rule 54(d)(2) . . . at a time the Court sets. Notice of the motion must be served on all parties and . . . directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1). Rule 54 allows that such a motion is timely if made in accordance with deadlines established in a Court order.

Here, the Fee Committee has met the procedural requirements. The Aggregate Fee Petition was timely, as it complied with the amended deadlines first established in Pretrial Order 59(A). In the motion, the Fee Committee references the applicable grounds for the award, provides the amount sought, and it describes the applicable terms of the portion of the Settlement Agreement which outlined the procedure for determining fees related to the Consumer Class claims. The motion was publicly filed, and the Court heard argument from the parties during a hearing that was open to the public and all Class Members, as contemplated in Section 14.1 of the Settlement Agreement. The Court has only received a single opposition to the motion, even though the motion was filed on January 20, 2017, nearly two months prior to the March 15, 2017, hearing date.

### B.      Fairness, Reasonableness, & Adequacy

Attorneys' fees and costs, authorized by law or the parties' agreement, must be reasonable. Fed. R. Civ. P. 23(h). "The decision of an award of attorney fees in a common-fund case is committed to the sound discretion of the trial court, which must consider the unique contours of the case." Manual for Complex Litigation § 14.121 (4th ed. 2004). As this Court has previously indicated in the Vioxx litigation,[5] courts have increasingly utilized a percentage award to determine attorneys' fees in cases with a common benefit fund. The percentage method provides more predictability to attorneys and class members or plaintiffs, encourages settlement, and avoids protracted litigation for the sake of racking up hours, thereby reducing the time consumed by the court and the attorneys. *See* Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar CrossCheck: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases,* 18 Geo. J. Legal Ethics 1453, 1456–57 (2005) (citing *In re Activision Sec. Litig.,* 723 F.Supp. 1373, 1378 (N.D.Cal.1989)); *accord In re Diet Drugs,* 582 F.3d 524, 540 (3d Cir. 2009)).

Furthermore, the United States Supreme Court has approved the percentage method in common fund cases, while it has never formally adopted the lodestar method in common fund cases. *See Camden I Condo. Ass'n v. Dunkle,* 946 F.2d 768, 773–74 (11th Cir. 1991) (interpreting *Blum v. Stenson,* 465 U.S. 886, 900 n.16 (1984), as the Supreme Court's "acknowledgment" of the percentage method in common fund cases); *In re Prudential–Bache*

---

[5] The popularity of this method gained momentum following the publication of the aforementioned Third Circuit Task Force report in 1985. Recognizing the "contingent risk of nonpayment" in such cases, courts have found that class or lead counsel ought to be compensated "both for services rendered and for risk of loss or nonpayment assumed by carrying through with the case." *In re Combustion, Inc.,* 968 F.Supp. 1116, 1132 (W.D. La. 1997) (summarizing the various methods used to calculate attorneys' fees); *see In re Cabletron Sys., Inc. Sec. Litig.,* 239 F.R.D. 30, 37 (D.N.H. 2006) (stating that the percentage method "allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure") (quotation omitted); *see also* Samuel R. Berger, *Court Awarded Attorneys' Fees: What is 'Reasonable'?,* 126 U. Pa. L. Rev. 281 (1977). *In re Vioxx Prod. Liab. Litig.*, No. 11-1546, 2013 WL 5295707, at *2–3 (E.D. La. Sept. 18, 2013).

*Energy Income P'ships Sec. Litig.,* MDL No. 888, 1994 WL 150742, (E.D. La. Apr. 13, 1994)

(tracing the history of the various methods).

While the Fifth Circuit has not explicitly endorsed a pure percentage method, it has

approved the use of a blended method when determining attorney fees in common benefit cases.

*See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir. 2012). In the

Union Asset Management Holding case, the Fifth Circuit announced:

> To be clear, we endorse the district courts' continued use of the percentage
> method cross-checked with the Johnson factors. We join the majority of circuits
> in allowing our district courts the flexibility to choose between the percentage and
> lodestar method in common fund cases, with their analyses under either approach
> informed by the Johnson considerations.

*Id*. Thus, the Fifth Circuit approves use of the percentage method, so long as the Court

also applies the *Johnson* framework to ensure that the fee awarded is reasonable. *See id.; Strong

v. BellSouth Telecomms., Inc.,* 137 F.3d 844, 851–52 & n.5 (5th Cir. 1998); *Forbush v. J.C*

*Penney Co.,* 98 F.3d 817, 823–25 (5th Cir. 1996).

Accordingly, district courts in this Circuit have frequently applied a "blended" percentage

method to determine a reasonable fee award, while staying within the *Johnson* framework. *See,*

*e.g., In re OCA,* 2009 WL 512081, at *19; *In re Enron Corp. Sec., Derivative & ERISA Litig.,*

586 F.Supp. 2d 732, 766, 778 (S.D. Tex. 2008); *Turner v. Murphy Oil USA, Inc.,* 472 F.Supp. 2d

830, 859–61 (E.D. La. 2007); *In re Bayou Sorrel Class Action,* No. 04–1101, 2006 WL 3230771,

at *3 (W.D. La. Oct. 31, 2006); *In re Educ. Testing Serv. Praxis Principles of Learning &*

*Teaching: Grades 7–12 Litig.,* 447 F.Supp. 2d 612, 628–29 (E.D. La. 2006); *Batchelder v. Kerr–*

*McGee Corp.,* 246 F.Supp. 2d 525, 531 (N.D. Miss. 2003); *In re Combustion, Inc.,* 968 F.Supp.

at 1135–36; *In re Catfish Antitrust Litig.,* 939 F.Supp. 493, 499–501 (N.D. Miss. 1996). *In re*

*Vioxx Prods. Liab. Litig.,* 760 F.Supp.2d 640, 651–52 (E.D. La. 2010).

15

As it has determined multiple times throughout the *In re Vioxx Products Liability Litigation*, the Court finds that the blended percentage approach for calculating reasonable common benefit attorneys' fees is also the appropriate method for determining attorneys' fees in the Consumer Class aspect of the litigation. As such, the Court will (1) "determine the valuation of the benefit received by the claimants and then select an initial benchmark percentage," (2) "determine whether the benchmark should be adjusted based on the application of the *Johnson* factors to the particular circumstances of this case," and (3) "conduct a rough lodestar analysis to cross-check the reasonableness of the percentage fee award," however it must also be noted that "[t]he lodestar analysis is not undertaken to calculate a specific fee, but only to provide a broad cross check on the reasonableness of the fee arrived at by the percentage method." *Id.* at 652.

### 1.      Value of Benefit & Benchmark Percentage

As an initial matter, the Court must determine the value of the benefit received by the claimants. Here, the Class Settlement was "a Common Fund settlement with a maximum payment by Merck of up to $23 million ("the Settlement Amount")." *In re Vioxx Litigation* Settlement Agreement Related to Consumer Class Actions, p. 5. The Court established a Common Fund Escrow Account, where Merck made an initial deposit of $6 million. The Settlement Agreement provided that Merck would make additional deposits "to the extent necessary to pay valid Class Member claims." *In re Vioxx Litigation* Settlement Agreement Related to Consumer Class Actions, p. 7. However, the amount of money actually paid to claimants was much lower than the total settlement amount, as only $698,767.22 was disbursed to plaintiffs.

In *Boeing Co. v. Van Gemert*, the United States Supreme Court explained that in common benefit cases, plaintiffs' "right to share the harvest of the lawsuit upon proof of their identity,

whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 480 (1980). While the Fifth Circuit has not issued a bright line rule establishing how to calculate the value of the benefit to plaintiffs in common fund cases, it has interpreted *Boeing* to stand for the proposition that "an attorney who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole, including the unclaimed portion." *Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 852 (5th Cir. 1998). In *Strong*, class members alleged that Defendants violated antitrust laws by automatically enrolling all customers in a service plan, unless they affirmatively opted out. *Id*. at 847. In the relevant portion of the settlement agreement, consumers were given the right to withdraw from the plan and receive a statement credit for any amounts they had already paid for the service, or continue their enrollment with the plan. *Id*.

When addressing attorney fees, Class Counsel in *Strong* argued they were entitled to a percentage of the maximum settlement amount assuming every customer had chosen to opt out of the agreement and receive the statement credit. *Id*. Instead, the District Court focused on the actual amount received by Plaintiffs, after reviewing the facts and circumstances of the case. In particular, the Court explained that the settlement agreement did not establish a common benefit fund, but only provided coupon like benefits. *Id*. at 851-53. Further, the Court emphasized that the attorneys had already received a fee above the lodestar, and were seeking a multiplier. On appeal, the Fifth Circuit recognized that *Boeing* requires attorney fees to be calculated as a percentage of the entire settlement amount, but held that given the "atypical circumstances of this case, the district court did not abuse its discretion in considering the actual results of the settlement." *Id*. at 853. Thus, while the Fifth Circuit has upheld an award based on the

percentage of a settlement actually paid to plaintiffs, it also recognizes that generally, in consumer common fund cases attorney fees should be a percentage of the entire available settlement amount.

Additionally, courts outside the Fifth Circuit have applied the *Boeing* rule and held that attorney fees should "be awarded on the basis of the total funds made available, whether claimed or not." *Masters v. Wilhelmina Model Agency, Inc*., 473 F.3d 423, 437 (2d. Cir. 2007); *see also Waters v. Int'l Precious Metals Corp*., 190 F.3d 1291, 1295 (11th Cir. 1999) (affirming district court's decision to award attorneys' fees as a percentage of the entire settlement amount, rather than only the amount disbursed to plaintiffs); *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (holding that "the district court abused its discretion by basing the fee on the class members' claims against the fund rather than on a percentage of the entire fund or on the lodestar.").

The Sixth Circuit recently addressed this issue and held the best method to determine the "total benefits to the class" is by conducting a case-by-case evaluation so that the district court can evaluate the length and complexity of the litigation in order to determine the true benefit bestowed on plaintiffs. *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 286 (6th Cir. 2016), *cert. denied sub nom. Blackman v. Gascho*, 137 S. Ct. 1065 (2017), and *cert. denied sub nom. Zik v. Gascho*, 137 S. Ct. 1065 (2017). In reaching this decision, the Court reasoned:

> Consumer class actions, furthermore, have value to society more broadly, both as deterrents to unlawful behavior—particularly when the individual injuries are too small to justify the time and expense of litigation—and as private law enforcement regimes that free public sector resources. If we are to encourage these positive societal effects, class counsel must be adequately compensated—even when significant compensation to class members is out of reach (such as when contact information is unavailable, or when individual claims are very small). An inflexible, categorical rule neglects these additional considerations.

*Id*. at 287.

While this Court does not endeavor to adopt a categorical rule based on either of these approaches, it finds that each approach should be considered when determining the value of the Vioxx Consumer Class settlement. In this case, the "total funds made available" were $23 million. *See Master*s, 473 F.3d at 437. "To fully discharge its duty to review and approve class action settlement agreements, a district court must assess the reasonableness of the attorneys' fees." *Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 849 (5th Cir. 1998). This necessitates a discussion of whether the maximum settlement amount is a reasonable measure of the "total benefits to the class" in this particular case.

Here, Consumer Class counsel worked diligently to reach a settlement agreement which would fully compensate Plaintiffs for their damages. Plaintiffs in the Consumer Class who had documented evidence they had taken Vioxx were entitled to full reimbursements for all costs they spent on the drug. In addition, if any individuals had incurred medical expenses in relation to their Vioxx prescription, they were entitled to reimbursement of up to $75.00 for these expenditures. *See* Settlement Agreement, R. Doc. 64501-3 at 8. For example, if a Plaintiff was required to complete an additional medical exam in order to find a replacement drug after Vioxx was taken off the market, the costs from this exam could be recovered from the settlement fund up to $75.00. Even if a Plaintiff did not have proof they took the drug, but had documentary evidence they received a prescription, they were entitled to some relief. The $23 million settlement amount was reached after Defendant and Plaintiffs laboriously considered the potential costs of these consumer class claims. However, the ultimate dollar amount paid to Plaintiffs was much less than the amount Merck had agreed to set aside for claimants. Thus, it is necessary to evaluate which amount is a better measure of the benefit to Plaintiffs—the amount Merck agreed to set aside for Consumer Class claims, or the amounts paid to claimants?

19

To answer this question, it is imperative to understand how the Consumer Class claims fit within the larger context of the Vioxx litigation. This MDL was certified on February 16, 2005. The parties reached a settlement on the Consumer Class claims in 2012—more than seven years after the inception of this litigation. Through no fault of counsel, the Consumer Class claimants were addressed later in the litigation. This delay probably caused a lack of interest among Consumer Class Plaintiffs. Additionally, many of the claimants in the Consumer Class were only entitled to small reimbursements, which may have provided an insufficient incentive to conduct the necessary research to find documentary evidence they had taken the drug. However, this does not undermine the total benefits to which class members were entitled or to which society benefitted from the deterrent effect of this settlement. As the United States Court of Appeals for the Third Circuit explained, "There are a variety of reasons that settlement funds may remain . . . Class counsel should not be penalized for these or other legitimate reasons unrelated to the quality of the representation they provided." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013).

Further, the Court agrees with the Fee Committee that Consumer Class Claims are unique within the world of class actions. These claims were brought pursuant to state consumer protection statutes, and by aggregating them into a class, Plaintiffs were able "to pool claims which would be uneconomical to litigate individually." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). "In enabling small-claim suits, class actions expose the defendants to the risk of liability and thereby deter them from engaging in wrongdoing in the first place. [This] compensatory mechanism thereby serves a deterrent function." Newberg on Class Actions § 1:8 (5th ed.). Thus, the Settlement Amount in this case not only provided a direct benefit to class members in the form of compensation, but also benefits both class members and the general

public, as the settlement amount serves to deter future misconduct. To base attorneys' fees solely on the amount paid to claimants in this case would completely disregard these other substantial benefits. Therefore, the Court finds that, in this case, the maximum amount of the settlement fund, $23 million, is the appropriate amount for calculating a reasonable percentage of common benefit fees in this case.

Next, the Court must then determine a benchmark percentage. The Court must not simply rubber-stamp the proposed figure, but instead attempt to arrive at an independent and justified reasonable percentage that is appropriate under the specific circumstances presented in each case. Courts routinely use empirical studies of attorneys' fees in class action settlements when computing the appropriate benchmark percentage. *See Turner v. Murphy Oil USA, Inc.,* 472 F.Supp.2d 830, 863 (E.D. La. 2007). As this Court has previously discussed:

> [D]istrict courts awarded fees over a broad range when they used the percentage-of-the-settlement method . . . with or without a lodestar cross-check and the fee percentages were ascertainable. These fee awards are exclusive of awards for expenses whenever the awards could be separated by examining either the district court's order or counsel's motion for fees and expenses (which was 96 percent of the time). The awards ranged from 3 percent of the settlement to 47 percent of the settlement. The average award was 25.4 percent and the median was 25 percent.

> Most fee awards were between 25 percent and 35 percent, with almost no awards more than 35 percent. Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Award,* 7 J. Empirical Legal Stud. 811, 833 (2010). The *Manual for Complex Litigation* states that a fee of 25% of a common fund "represents a typical benchmark." *See* Manual For Complex Litigation § 14.121. However, scholars note that "a scaling effect exists, with fees constituting a lower percent of the client's recovery as the client's recovery increases." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study,* 1 J. Empirical Legal Stud. 27, 28 (2004). In other words, the lower the recovery, the higher the percentage.

Here, Class Counsel has requested fees of 32% of the settlement fund, which was the maximum amount the parties agreed to under the settlement agreement. Nonetheless, the Court has a duty to ensure the fee award is reasonable under the facts and circumstances of the case.

21

*Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 849 (5th Cir. 1998). "Even when the parties have reached an agreement on the amount of attorney fees, a district court "must scrutinize the agreed-to fees under the standards set forth in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974), and not merely ratify a pre-arranged compact." *Id*. (internal quotations omitted).

Further, the fee in the Consumer Class claims must be considered in the context of the entire MDL. The attorney fee for the personal injury portion of this case was 6.5% of the Master Settlement Agreement, which was $4.85 billion. *In re Vioxx Prod. Liab. Litig.,* 760 F. Supp. 2d 640, 658 (E.D. La. 2010). In reaching this amount, the Court noted that a smaller percentage was justified in light of the substantial settlement amount. *Id*. In reaching that number, the Court followed the pattern of scale effect commonly seen in class action litigation—"[a]ttorneys receive a smaller proportion of the recovery as the size of the recovery increases." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements:* 1993– 2008, 7 J. Empirical Legal Stud. 248, 279 (2010). Notably, the benefit to Plaintiffs in the Consumer Class settlement was considerably smaller than the benefit Plaintiffs received for personal injury claims in the master settlement agreement. Following the reasoning of Eisenberg & Miller, which has been applied in numerous other courts,[6] the percentage of the fee recovery in the Consumer Class portion of the litigation should be greater than the percentage awarded as a fee in relation to the master settlement agreement.

---

[6] As this Court previously explained, other courts have followed this principle when evaluating appropriate benchmark percentages in class settlements. *See In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.,* 733 F.Supp.2d 997, 1012–15 (E.D.Wis.2010); *Murphy Oil,* 472 F.Supp.2d at 862–64; *In re ETS,* 447 F.Supp.2d at 630; *Allapattah Servs., Inc. v. Exxon Corp.,* 454 F.Supp.2d 1185, 1212 (S.D.Fla.2006); *In re Cabletron Sys.,* 239 F.R.D. at 37 n. 12, 41. The Eisenberg and Miller studies are helpful for providing concrete evidence for the relationship between the amount recovered and the attorneys' fee award; the empirical data shows that as settlement amounts rise, the reasonable percentage of attorneys' fees decreases. Eisenberg & Miller 2004 at 54–55; Eisenberg & Miller 2010 at 263–65.

However, it cannot be ignored that the amount of actual recovery in this case was low—far lower than anticipated. As a result, the Court now faces the unenviable task of determining how to award attorneys a reasonable fee, when any reasonable fee will likely be superior to the funds received by claimants. First, it is undeniable that the temporal delay in addressing these claims resulted in decreased participation in the Consumer Class claims. Individuals may have no longer had access to the documentation to recover these funds, they may have been unmotivated by the relatively small individual recovery amounts, or they may have simply forgotten. In any event, the decreased interest was in no way attributable to the significant efforts of class counsel. To the contrary, class counsel continuously employed innovative and diligent methods to ensure claimants had every opportunity to pursue their claims. The consumer claims were aggressively handled by competent attorneys. Notice was creative and painstaking—using groundbreaking methods such as social media and translation services to reach as wide an audience as possible.

Second, it is important to note that any remaining funds will revert to Defendant—the tortfeasor—in this case. Given that fact, Defendants will benefit both directly and indirectly if a small fee is awarded in this case. If Consumer Class counsel receive a small fee, Defendants will indirectly benefit as an insufficient fee will serve to disincentivize future attorneys from taking on these types of claims. Further, Defendants will receive a direct benefit in that any money not paid to counsel will revert back to them. As one commenter has noted "limiting counsel to a percentage of the class's actual recovery in a claims-made or reversionary fund situation is likely to disgorge significantly less money overall, providing *defendants* with what might be characterized as a windfall. All things being equal, it seems more defensible that class attorneys, rather than defendants, receive the excess." Newberg on Class Actions § 15:70 (5th ed.)

23

In light of the foregoing, and guided by this Court's observations over the last twelve years of the nature and scope of the work and effort of those attorneys who worked on the Consumer Class cases and settlement, the Court finds that 17.5% of the total available settlement amount is a reasonable benchmark percentage for a common benefit fee award in this case. This figure is more than double the percentage awarded as a fee in the personal injury cases, in light of the extra time and effort that went into litigating the consumer class claims. Furthermore, the Consumer Class settlement of $23 million was significantly smaller than the $4.85 billion Master Settlement, and necessitates a higher percentage in order to ensure a reasonable fee. This figure is within the range of similar MDL awards and assessments. Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008,* 7 J. Empirical Legal Stud. 248, 262 (2008) (explaining that the mean percentage fee in consumer class cases is 25%, with a median fee of 20%). No part of this 17.5% will come from the recovery of any Vioxx claimant; rather, it will be assessed directly against the funds Merck set aside as part of the Consumer Class settlement. It is now appropriate to test this percentage in the crucible of the *Johnson* factors to determine whether an adjustment, upwards or downwards, is in order.

### 2.    *Johnson* Framework

In awarding attorneys' fees and costs, the Court must employ the *Johnson* framework as the basis of its analysis, it must not proceed in a summary fashion, and it must set an amount that "can be said to be just compensation." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.,* 669 F.3d 632, 642 (5th Cir. 2012). The *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the

attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.,* 669 F.3d 632, 642 n. 25 (5th Cir. 2012) (citing

*Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974), *overruled on other*

*grounds by Blanchard v. Bergeron,* 489 U.S. 87 (1989)).

The recorded hours by the Court-appointed CPA totaled 9,891.49. This time includes all

attorney time vetted, approved, and accepted by the Court-appointed CPA as work performed in

connection with the consumer case.

The consumer portion of the litigation spanned more than twelve years, and counsel

worked diligently throughout that time to develop these claims. Second, the Consumer Class

involved claims based on forty-four state consumer protection statutes. Thus, Class Counsel had

to evaluate the claims under multiple different state laws, increasing the complexity of the case.

*See* R. Doc. 790 at 60-75. They demonstrated industry and ability through intensive discovery

and pretrial efforts, as well as briefing and arguing discovery and dispositive motions which

contributed to the global settlement. Third, considerable skill was required of counsel in this

case, both in coordinating the litigation, contacting claimants, assisting them in locating

prescriptions and other medical documentary evidence, as well as negotiating an advantageous

settlement. Fourth, the number of potential class members was uncertain at the time this action

was filed, requiring counsel to remain unencumbered by other obligations for an extensive period

of time. Fifth, the fee here, as noted above, is within the range of fees in other similar actions.

Sixth, the fee is contingency-based, and counsel risked the possibility of no recovery whatsoever.

Seventh, the circumstance of this case certainly created temporal limitations, as a substantial

amount of time passed between when Plaintiffs took the drug, and when they were able to pursue

their Consumer claims. Eighth, the amount of each individual's recovery was relatively low and

there was a possibility that no recovery would be obtained. Ninth, the attorneys here had significant experience, strong reputations, and adequate ability. Tenth, the relatively low amounts involved and uncertain class size made the case relatively undesirable. Eleventh, counsel was actively engaged with the Class Representative throughout the litigation and, to a lesser extent, also engaged with the other Class Members. Twelfth, the award allows those claimants who fully participated in the settlement to recover all of their costs associated with the prescription drug Vioxx.

### 3. Lodestar Cross Check

The Court must next conduct a lodestar cross check to determine the appropriateness of the benchmark percentage in this case. "In recognition of the noted disadvantages of the lodestar method as the principle means for determining attorneys' fees, such as the taxing of judicial resources by examining every time entry and billing rate for each attorney, a lodestar analysis which is rough and more abbreviated is appropriate for a cross check." *Turner v. Murphy Oil USA, Inc.,* 472 F. Supp. 2d 830, 867 (E.D. La. 2007).

The Court appointed CPA reports that the vetted and approved hours spent by counsel on common benefit work on the consumer aspect of the case total 9,891.49 hours. *See* Garrett's Case Cost Management System Report from November 2004 to March 2017. Seventeen and one half percent of the total amount of the settlement equals $4,025,000 which results in an hourly fee of $406.92. Class Counsel did not provide individual billing rates by the Fee Committee members, however, the Court has previously relied on an average hourly rate of $443.29 per hour for attorney rates in Vioxx personal injury litigation. *See* In re Vioxx Prods. Liab. Litig., 760 F. Supp. 2d 640, 600 (E.D. La. 2011). While the hourly rate in the Consumer Class is lower than the hourly rate awarded in the personal injury portion of this MDL, the Court finds a rate of

$406.92 is still adequate. In particular, the Court notes that the lower hourly rate is justified in light of the lower amounts actually received by the Plaintiffs in the Consumer Class and the fact that no trials occurred in this aspect of the MDL. Thus, a fee of 17.5%, or $4,025,000, appears to be reasonable. The reasonableness of the fee in this case is made even more apparent when one considers that it was contingent, that it is paid by the defendant not the claimants, and that if not paid to the plaintiffs' counsel, it would revert to the defendant tortfeasor.

V.    **CONCLUSION**

For the foregoing reasons,

**IT IS ORDERED** that the Common Benefit Fee and Cost Committee Motion for Aggregate Fee Petition, R. Doc. 65491, is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Class Counsel is awarded attorneys' fees of $4,025,000, or 17.5 % of the $23,000,000 settlement fund, which amount should be placed in the registry of the Court within two weeks. Thereafter, the Court will conduct future proceedings to determine the distribution of the fee among the attorney applicants.

New Orleans, Louisiana, this 29th day of August, 2017.

_____
UNITED STATES DISTRICT COURT JUDGE