**JOHNSON & PERKINSON**
1690 Williston Road
South Burlington, VT 05403
802-233-2007

Dennis J. Johnson, Esq
djohnson@jpclasslaw.com

August 27, 2018

<u>Via efiling</u>
Honorable Eldon E. Fallon
U.S. District Court
E.D. Louisiana
500 Poydrus Street, Room C-456
New Orleans, LA 70130

**Re: VIOXX, MDL 1657, Johnson & Perkinson's Request for Allocation of Fees and Reimbursement of Expenses**

Dear Judge Fallon:

    As the Senior Partner of Johnson & Perkinson ("J&P"), I am filing this letter brief in support of J&P's request for a fair and reasonable fee award and reimbursement of expenses in the consumer class.

    J&P was one of the few firms that filed class cases on behalf of consumers, which subsequently became part of the MDL Consumer litigation. My sworn Declaration in support of J&P's fee request and request for reimbursement of expenses, dated January 13, 2016, was filed with the Court in January 2017 as Exhibit G to Plaintiffs' Petition for an Aggregate Award of Fees and Expenses, and we incorporate the contents of that Declaration herein ("Johnson Declaration").

    More than two years have passed since the Fee Committee appointed by Your Honor was charged with the task of making fee allocation recommendations. As far as we can determine, no clear conclusions having been reached by that Committee.

1

Instead, it appears that that Committee is deadlocked, given the diverse group of applicants, several of which were not part of the MDL consumer cases. We are hopeful that the Court will resolve these matters following the upcoming hearing.[1]

## Johnson & Perkinson's Role in the Litigation

Before the MDL situs was determined, J&P filed class cases on behalf of consumers in Vermont and Massachusetts, alleging consumer fraud claims, entitling consumers to full reimbursement of all monies spent to acquire VIOXX, if successful. Until such time as these cases were transferred into the MDL, we dealt with various issues of service and other matters in the local courts. All efforts expended prior to the formation of the MDL were expended on behalf of our consumer class cases, which became part of the MDL. We did not litigate any personal injury cases.

Once the MDL was formed, J&P undertook the following activities on behalf of the consumer cases:

---

[1] As the Fee Committee has been informed, J&P has effectively been wrapping up its affairs for years, as the undersigned is attempting to retire after more than 35 years of class action litigation. This is our last open case. As the Committee was also made aware, in an effort to eliminate unnecessary expenses, our firm discontinued its PACER membership. Although our firm was involved in virtually every aspect of the underlying MDL consumer litigation, and was in regular communication with the limited number of firms conducting that litigation prior to settlement, we were not invited to participate in the settlement discussions or to serve on the Committee. While we have attempted to stay on top of the progress of the fee allocation issues, our repeated requests to the FCC for status information, what the various claims for entitlement to fees are, or how the Committee views the various claims have in large part been ignored. Thus, though we have made repeated efforts to determine the bases for fee requests by firms which did not participate in the MDL proceedings, or their activities undertaken and the amounts of fees incurred in undertaking those activities by those firms, those requests were denied by the Fee Committee based on ¶5 of Pretrial Order 59A, which states that communications between and among the Fee Committee members are privileged, confidential and not discoverable prevents them from sharing information with other fee applicants. Respectfully, we believe the Court likely sought to prevent Defendants or class members from discovering confidential negotiations between members of the FCC or between the FCC and fee applicants, not to prevent the FCC from revealing among the fee applicants the fee applications of other applicants, what other applicants did in the litigation and how much time they claim to have spent doing so. This information sharing has routinely been made in cases in which we have been involved and is vital to any fee applicant's ability to determine if its allocation of fees is fair, reasonable and adequate compared to the fee awards made to others.

- J&P filed a Motion to Transfer, to the MDL, the Vermont and Massachusetts actions J&P had previously filed;
- J&P applied to the PSC. We appeared at the first two MDL hearings before this Court. At the first, we addressed the Court on the importance of separate representation for the consumer cases. The second we attended at the invitation of the Court (statements made at the first hearing inviting me to do so) and to continue to monitor the situation to ensure separate representation for consumers, since a subcommittee designed to provide such independent representation had not yet been appointed;
- J&P traveled to San Diego to interview a former Merck scientist and, while in California, attended the VIOXX seminar in Pasadena;
- J&P was invited by the PSC to be a member of the Plaintiff's Economic Committee ("PEC"), established to guide the consumer litigation, and thereafter served on that Committee from its inception, participating in all conference calls of this Committee. At the request of the PEC, J&P attended an in person meeting of the PEC in New Orleans, held immediately prior to one of the hearings before the Court, and, since J&P was present, also attended the hearing;
- J&P served on the PEC subcommittee with responsibility for drafting the Master Purchase Claims Complaint ("MPCC"). Beyond working on the allegations of the document, which started off over 150 pages, J&P had the job of canvassing all state consumer laws to summarize the requirements for successfully bringing an action in each of the states and the relief which might be available in those states (for example, damages, medical monitoring, and/or return of consideration), summarizing our research in a 38 page single spaced document given to the subcommittee. We participated in all conference calls of this subcommittee as well;
- J&P sent an attorney to New York to review documents for use in pleading the allegations of the MPCC;
- J&P served on the PEC subcommittee formed to respond to Defendant's Motion to Dismiss. We drafted portions of the MTD opposition papers addressing Vermont; Massachusetts; UCC issues; the applicable Rule 9(b) standards; the standing of a plaintiff in one state to represent, in a class action, purchasers in other states without a named representative; choice of law issues;

3

and the constitutionality of a nationwide class. A J&P associate attended an in person drafting session on the MTD, at the request of the PEC;

- J&P served on the PEC subcommittee formed to draft Plaintiffs' Motion for Class Certification. We played a major role in drafting the state claims portion of the class motion;
- After Defendant filed its Opposition to our Motion for Class Certification, J&P performed research on reliance issues and participated in drafting our Reply Memorandum in support of our Motion;
- J&P served on the PEC's subcommittee responsible for opposing Defendant's Motions for a) the entry of a Case Management Order and b) Judgment on Class Certification and/or to Strike Class Allegations. Our focus was primarily on Massachusetts and Vermont, but we participated in the review and analyses of the laws of, and issues affecting, multiple other states as well;
- We participated in PEC's conference calls regarding the settlement, during which notice issues were regularly discussed; and
- J&P responded to all requests for information made by the Fee Committee, through multiple iterations of our participation throughout the litigation and by appearing, via Skype, for the required interview pertaining to the same.

As the activities listed in the prior dissertation make clear, up until settlement, we were involved in most all substantive aspects of the Consumer litigation, save hearings on motions or status conferences held before the Court. There were no depositions were taken in this case. No documents were produced in this case. There were no bellwether trials for the consumer cases. To the best of our knowledge, no consumer case attorney requested or received the PSC's trial package for use in a consumer case in the MDL. As it turned out, this litigation turned on the creation of the MPCC; defending the MPCC against Defendant's Motion to Dismiss; the filing of plaintiffs' Motion for Class Certification; defending that Motion against Defendant's repeated efforts to seek the entry of Orders which would have effectively denied us class relief; and defending against Defendant's efforts to obtain entry of an Order granting Defendant judgment on the pleadings. Confirming this fact and, given the

4

lack of common expenses in this case, no requests for litigation contributions were made, as each firm shouldered its own expenses for performing its tasks.

Our commitment to the litigation was unwavering. Demonstrating the point, the emails sent to the PEC by its Chairperson, Attorney Cabraser, were routinely sent to seven law firms, only two of which had two attorneys on the email list, demonstrating the level of participation by those firms. We were one of those two firms.  Throughout the litigation, J&P sought to efficiently litigate this matter, as it principally manned by one partner, the undersigned, and the firm's senior associate at the time, with one or more of the firm's other associates performing tasks on an as needed basis.  Following the issuance of Pretrial Order 59, we reviewed all of our time since the inception of the case through the cut off date specified in that Order, eliminating several inadvertent duplicative time entries; time which we did view as being productive, though appropriately billed initially (such as time expended by attorneys who did not ultimately play a significant role in the litigation); and any time which we could not say for sure was expended on the behalf of the plaintiffs in this case (such as answering injury questions from consumers).  In fact, various time entries were deleted even though they had previously been approved by the Garrett firm.  All of our time was expended at the expense of time which could have been spent on other litigations.  Virtually all of our time in this case was expended prior to the time when the payment of some amount for the fees expended became all but ensured, after a settlement agreement in principle had been reached.  Time expended at full risk has repeatedly been afforded a greater multiplier by courts than time expended after payment of fees is more certain.

Our fee request is likely the simplest of any of the fee requests. None of our time was contemporaneously billed to this and another case, such as the TPP or the

Government Entity cases.[2]  We did not file a TPP case, nor did we litigate any personal injury cases.  Whereas others, after the fact, have apparently been forced to try to allocate time between this matter and others, we had no such issue. We have received no pay for any of our submitted fees.  The Garrett firm approved 1,374.5 hours of time for J&P.[3]  Based on the Court's blended rate of $443.29 per hour, our modified lodestar is $609,302.15.  Based on that lodestar amount, we respectfully request that we be awarded a *pro rata* portion of the overall fee award.  Given that we

---

[2] J&P did perform a limited amount of document review and several other isolated tasks in the TPP case at the request of the leaders in that case. When the TPP case settled in 2009, J&P was asked to file a fee petition for work performed for the common benefit of the plaintiffs in that case. As we were uncertain how to determine what work of ours, if any, would be viewed to have benefitted the plaintiffs in that case, we submitted to Mr. Garrett's firm a single monthly report listing all our hours expended to date and asking that those reviewing them parse out what time they viewed as conferring a benefit on the plaintiffs in that case. Mr. Garrett's firm, based on our previously submitted periodic submissions of time and expense reports, approved 847 hours of our time. Notably, as Mr. Garrett has subsequently informed me, his task is not to determine common benefit but rather to determine if any time submitted was incurred for individual plaintiffs or if there are entries which, on their face, cannot be accurate, such as billing 25 hours in a single day, in which case such time would be rejected.

   Thereafter, in 2010, we were notified that we had been allocated $15,000.00 in fees in the TPP case. Before we signed the Affidavit required at that time agreeing that payment of such fees would be full compensation for the benefit conferred, we requested and received written assurance from Attorney Russ Herman, Chairman of the PSC and who also served on the Fee Committee in the TPP case, that the award was not intended to be compensation for work performed in the economic loss/consumer cases. Based on such assurance, we executed the Affidavit and thereafter received the $15,000 fee, which seemed reasonable to us given the very limited work we had performed which might be viewed as related to the plaintiffs in that case.  Any time expended on such matters was deleted by us prior to submitting our time in this case to the Garrett firm for its audit.

[3] This time does not include the time I expended a) to learn J&P's record keeping software, the Timeslips program, so that time entries which we struck pursuant to Pretrial Order 59 could be deleted (by then, no support staff was still in our employ); b) to attempt to master the Garrett program so as to upload our time and expense entries from Timeslips into that program and then to undergo the extensive effort necessary to categorize our time into the litigation activities identified in the Garrett program; c) to search the firm's records in storage for relevant documents to make our fee and expense submissions; d) to prepare our Declaration in support of our request for fees and reimbursement of expenses; e) to respond to the FCC's multiple requests for written submissions summarizing our work in the case; f) to prepare for and attend (via internet) the interview conducted by the FCC to discuss the same; g) to try to determine the status of the FCC's activities; and h) to prepare this submission and attend the upcoming hearing on September 11.

6

were involved in virtually all of the underlying litigation, it is difficult to conclude that any other firm is entitled to a multiple, or return, on their time greater than ours.

Request for An Additional Award of Expenses

The Garret firm approved J&P expenses of $8,522.23. While the amount of money is insignificant in comparison to the other matters before the Court, we respectfully ask the Court to increase our expense award by an additional $9,603.00, for a total expense award of $18,125.23 for the reasons set forth below. J&P has repeatedly asked the FCC to make the Court aware of this issue, but as far as we can determine, it has not done so.

During the Garrett review, I discovered that J&P's support staff never submitted any J&P expenses for the period from September 2004 through April 8, 2005, as they apparently did not understand they were supposed to submit reports created prior to the entry of PTO 6 (April 2005). J&P used a well accepted software program called Timeslips to contemporaneously record its time and expenses. Backup for such expenses were filed in our tax and/or litigation files. While the Timeslips reports for the above reference time period were in our computers, after an extensive search, I was unable to locate the backup papers for the expense entries in Timeslips for the above specified period of time, as they were apparently lost in the process of packing up the firm to move from its offices when the building was sold. I submitted expense reports for this period to the Garrett firm which were rejected for "failure to provide receipts," since the sole support for the expenses were the entries in Timeslips. J&P respectfully requests the Court nonetheless approve these expenses since a) they are supported by the entries made in Timeslips, which entries were made contemporaneously with the incurrence of the expenditures; b) our Timeslips reports satisfy Fed.R.Evid. 803 (records of a regularly conducted activity); c) numerous courts have accepted our Timeslips reports as sufficient proof of the expenses recorded

7

therein, without requiring backup to those entries; d) the expenses listed therein correspond to events in the litigation, and time billed for our activities in connection therewith, the bulk of which pertained to travel expenses incurred to attend the court's first two hearings and large copy costs incurred in connection with our application to become a member of the PSC; e) in September 2005, J&P had submitted its Timeslips records and backup for expenses to the PSC for the period April through August 2005. Confirming the accuracy of our Timeslips reports, each of the expense entries during that time period were borne out by backup documents; and f) due to the exigent circumstances surrounding the planned closing of J&P, when the underlying documents were lost. The amount of expenses incurred from September 2004 through March 2005 which are supported by Timeslips, but as to which the second layer of backup is not available, is $9,603.00  A list of the total expenses incurred by month during this period was attached as Exhibit 3 to my January 2016 Declaration. If the Court approves these expenses in addition to those set forth in the prior paragraph, our total reimbursable expenses would be $18,125.23.

General Observations Regarding the Fee Requests of Others

At the risk of alienating other applicants and/or FCC members, we believe that several matters are worthy of the Court's consideration at the upcoming hearing.  First, as to fee claims by Kentucky counsel for litigation consumer claims in the Kentucky state court system, while we offer no opinion on the amount of an award to such counsel, we note that claims were also pending on behalf of such people in the MDL and that Kentucky was included in the settlement agreement.  Fees incurred by such counsel could have been spent in the MDL, had counsel chosen to allow their case to be removed to federal court and transferred to the MDL. Had counsel in each state pursued the Kentucky strategy and then sought fees in the MDL, the amount of fees would be astronomical. That is not to say they are not entitled to an award, but

8

certainly one factor in determining the amount of such an award, is that the amount of fees (over 2,500 hours) for that one state is so great in comparison to the fees incurred in litigating for all states in the MDL, including that one.[4] It is also relevant that, while a class was certified in the lower court, it was decertified on appeal. While the appellate decision was appealed to the Kentucky Supreme Court and Kentucky counsel asserts the Supreme Court would have decided in the class' favor had it decided the issue prior to the settlement, this had not occurred.  Finally, fees incurred by Kentucky counsel which impeded and/or delayed the progress of the MDL settlement (oppositions to class notice and progress of the settlement) should not be paid for by the settlement class. No benefit was conferred on the class as a result of such efforts.

Second, as to the Oldfather firm claim for fees for *Daubert* work in various personal injury cases, initially it should be noted that, while there have been instances where work outside a class case has been held to be compensable in a class case under the common benefit theory, doing so requires a causal connection demonstration.  No one in this case requested or relied in any way on such work or findings. Similarly, we did not request or rely on the PSC's trial packet. While one may surmise that Defendant was cognizant that any number of personal injury cases had resulted in a causal finding between the drug and injury, it is unclear that the Oldfather *Daubert* cases were on its mind. The public records of any of the personal injury cases decided in plaintiffs' favor would have provided counsel in the MDL with the proof they would have needed to show the causal connection to injury, if they concluded they needed such proof.  Thus, consumers did not need to prove causation, just that the

---

[4] Similar considerations present themselves as to fees sought by counsel for any other state court litigations on behalf of consumers. Given the FCC's unwillingness to share information, we are not exactly sure who is seeking fees from the settlement fund.

risks of the drug were inadequately revealed to consumers when they purchased it. It seems like any firm with personal injury cases could make the same argument.

Finally, we are confused about how a finding of *Daubert* causation was made in cases in which no fees were obtained by counsel representing such plaintiffs. Are fees being sought for personal injury cases litigated by the Oldfather firm which were not resolved in their plaintiffs' favor, while the firm has been paid for others in which these findings were made? Notably, the Garrett audit made no effort to determine a causal connection or benefit to the class.

It appears these fees are being sought alternatively from a General residual fund, which appears to be fund which is not part of this settlement, or the settlement fund in this case. I address this issue only as it applies to the settlement agreement fee award. To the extent there is a General Fund that may apply to such work, we take no position as it may relate that fund.

## The Degree of Risk Assigned to Various Categories of Time

Numerous courts have recognized that time expended by counsel which is incurred prior to the time payment on fees is more certain is awarded a greater return due to the degree of risk that such time may never be compensable (the risk multiplier). For years, the fees incurred in this matter have been virtually guaranteed to be compensated in some amount as there was, first, settlement discussions, then a settlement agreement, then Court approval of that agreement. The degree of risk decreased with each event and time spent later in the litigation should be afford a lesser return than time spent by counsel prior to those events. Virtually all of our time was expended prior to the settlement, as we were not invited to participate in settlement discussions or draft settlement documents. If the blended rate is 443.29, perhaps time spent at full risk should be paid at a higher rate and time after the risk was reduced at a lesser rate?

This same limitation on fees should be applied to time incurred by the Fee Committee.  Not only has there apparently been an extensive amount of such time and the benefit of such efforts are not at all clear (we do not know if the FCC firms are seeking payment for that time, as all fee information of any firm but your own has been withheld from non FCC firms), it has all been expended after the settlement agreement and court approval of that agreement.  If payment is being made for the expenditure of such time, it is respectfully suggested that it be at lesser rate of payment than fees incurred prior to the settlement.

        Respectfully,

        s/Dennis J. Johnson,
        VT3248
        Johnson & Perkinson
        1690 Williston Road
        South Burlington, VT 05403
        802-233-2007
        djohnson@jpclasslaw.com

CC:
Russ Herman (*via email*)
Elizabeth Cabraser (*via email*)
Leonard Davis (*via email*)
Dawn Barrios (*via email*)
Richard Getty (*via email*)
James Lyle (*via email*)
Ann Oldfather (*via email*)
Vince McKnight (*via email*)
DavidTittle (*via email*)
Gary Mason (*via email*)
Howard Bushman (*via email*)
Mark Griffin (*via email*)
Joyce Romano (*via email*)
Ben Barnow (*via email*)