|  |  |  |
|---|---|---|
|  | : | **MDL NO. 1657** |
| **IN RE: VIOXX** | : |  |
| **PRODUCTS LIABILITY LITIGATION** | : | **SECTION:  L** |
|  | : |  |
|  | : | **JUDGE FALLON** |
|  | : |  |
|  | : | **MAG. JUDGE KNOWLES** |
|  | : |  |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO ALL CASES**

## ORDER & REASONS

Currently pending before the Court is a petition seeking attorneys' fees and costs for the common benefit services rendered in connection with the consumer class portion of this litigation. R. Doc. 65491. The Court has previously resolved the issue of reimbursement of expenses, R. Doc. 65422, and now determines the appropriate amount for the consumer common benefit fee.

This is the second time this Court has focused on this issue. *See* R. Doc. 65537. On a previous occasion it reviewed various memoranda and supporting documentation provided by the parties, including numerous affidavits and declarations from individual attorneys who claimed to have performed common benefit work. It also reviewed reports submitted by Phillip Garrett, the Court-appointed certified public accountant (the "CPA") who monitored the time and expenses the attorneys submitted for their common benefit work. On August 29, 2017, the Court issued an Order & Reasons setting an award of $4,025,000 for the common benefit work performed by the attorneys in the consumer portion of the case based on 9,891.49 hours

submitted to the CPA. Thereafter, it was advised that additional hours had been spent by other counsel on common benefit work that were not included in the material considered by the Court in fashioning the appropriate fee. Accordingly, the Court vacated its Order & Reasons, R. Doc. 65545, and instructed all interested counsel to submit their common benefit hours to the CPA to accurately account for all of the common benefit work performed on the consumer portion of this litigation. This Court is confident that the record now properly reflects all the hours submitted by all counsel who seek a common benefit fee. Once again all of the material previously filed was reviewed as well as the additional material more recently received regarding the additional submitted hours. Lastly, the Court has examined the procedural record of the entire litigation and applied its own knowledge of the case accumulated through its active involvement in this litigation since its inception more than twelve years ago. The Court is fully advised and is ready to rule.

I.      BACKGROUND

To put this matter in perspective, a brief overview of this litigation is appropriate. This multidistrict litigation ("MDL") involves the prescription drug Vioxx, known generically as Rofecoxib. Merck & Company, Inc. ("Merck"), a New Jersey corporation, researched, designed, manufactured, marketed, and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. On May 20, 1999, the Food and Drug Administration (the "FDA") approved Vioxx for sale in the United States. Vioxx remained publicly available until September 30, 2004, when Merck withdrew it from the market after data from a clinical trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events, such as myocardial infarctions (heart attacks) and ischemic strokes. Thereafter, thousands of individual suits and numerous class

actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims and seeking recovery for damages resulting from heart attacks and ischemic strokes. It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999, and September 30, 2004. Based on this estimate, it was thought that approximately 20 million patients have taken Vioxx in the United States.

On February 16, 2005, the Judicial Panel on Multidistrict Litigation (the "JPML") conferred MDL status on Vioxx lawsuits filed in federal court and transferred all such cases to this Court to coordinate discovery and consolidate pretrial matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.,* 360 F. Supp. 2d 1352 (J.P.M.L. 2005). One month later, on March 18, 2005, this Court held the first status conference in the Vioxx MDL to consider strategies for moving forward with the proceedings. Shortly thereafter, the Court appointed a Plaintiffs' Steering Committee ("PSC") and Defendant's Steering Committee to represent the parties and meet with the Court once every month to review the status of the litigation. Some suits filed in state court were removed to federal court and transferred to this Court. Others remained in state court due to lack of diversity. California was the first state to institute a consolidated state court proceeding on October 30, 2002. New Jersey and Texas soon followed suit. This Court coordinated the MDL proceeding with these state courts and worked closely with the state court judges.

Additionally, a number of state and local governments filed suits against Merck seeking to recover amounts paid for Vioxx prescriptions by their Medicaid programs. Finally, several thousand claims were filed pursuant to state consumer protection statutes seeking to recover amounts paid for Vioxx as well as any penalties allowed under the state consumer laws. Merck

removed these cases to the appropriate federal district courts, where they remained briefly before being transferred to this Court by the JPML.

Because of the large number of cases and the varied theories of recovery, it was necessary to prioritize the handling of this litigation. The Court first focused on the 50,000 heart attack and stroke claims. Discovery began along several tracks. After the exchange of some nine million documents, several hundred depositions, and about one thousand discovery motions, this portion of the case was ready for trials. After six bellwether trials—as well as trials in state court proceedings in Alabama, California, Illinois, Florida, New Jersey, and Texas—the negotiating plaintiffs' counsel ("NPC") and Merck's counsel engaged in protracted settlement discussions over the course of a year, conducting hundreds of in-person and telephone meetings. On November 9, 2007, two years after the commencement of the MDL proceeding, the parties announced a $4.85 billion master settlement agreement ("MSA") that intended to—and actually did—resolve most Vioxx-related heart attack and ischemic claims through a resolution program. In its recitals, the MSA expressly states its purpose was to "establish a pre-funded, structured private 'opt-in' settlement program . . . to resolve . . . claims against Merck involving heart attacks, ischemic strokes and sudden cardiac deaths."

Having settled a large majority of the personal injury cases within this MDL, the Court turned its attention to government actions filed against Merck. Several government entities had pending litigation in this MDL, including suits brought on behalf of various states, including but not limited to Alaska, Colorado, Florida, Louisiana, Mississippi, Montana, Pennsylvania, Utah, Oklahoma, and South Carolina. These suits sought damages for monies paid by the state for Vioxx through the state's Medicaid program. These suits were based on similar claims, namely that each respective state would not have approved payment for Vioxx through its Medicaid

program had it known of the drug's cardiovascular risks. After one bellwether trial, the vast majority of these "government action" cases were either settled or remanded.

Finally, the Court turned its attention to the consumer claims. On August 2, 2005, the PSC filed a Purchase Claims Master Class Action Complaint ("Purchase Claims Complaint") naming individual consumers who purchased Vioxx for themselves. R. Doc. 790. The Purchase Claims Complaint sought relief under myriad laws, including state consumer protection statutes. *Id.* at 60–75. Plaintiffs in the Purchase Claims complaint took Vioxx, but did not suffer any ill effects from the drug and, therefore, did not qualify for participation in the opt-in settlement program. Nonetheless, Class Members sought recovery for a return of the purchase price of the drug, as well as any medical expenses that were directly related to their Vioxx prescription. Class Members argued that, even though they were not injured, had they known about the drug's negative side effects, they would never have purchased Vioxx.

After substantial settlement negotiations spanning several years, the parties reached a compromise regarding the Consumer Class claims in 2012. The Settlement Agreement allocates a common benefit fund of up to $23 million, from which Class Members may seek recovery for their total out-of-pocket provable costs for purchasing Vioxx and up to $75.00 in connection with post-withdrawal medical consultation related to Vioxx use or, in lieu thereof, a one-time payment of $50.00 with proof of a Vioxx prescription. Those amounts, however, were subject to a *pro rata* reduction if all claims, administrative, attorneys' fees, and other costs exceeded the $23 million cap.

The Settlement Agreement called for the establishment of a settlement website, toll-free phone number, and post office box to serve as sites where Class Members could obtain or request detailed Notice. Settlement Agreement ¶¶ 5.3–5.5; R. Doc. 64487 at 10. Moreover,

Kinsella Media, LLC ("Kinsella") developed a Notice plan to alert the class to the settlement. This plan called for a direct mailing to all counsel for the putative consumer class and paid media advertising, including a mix of print, broadcast, and online media, and a comprehensive online media campaign. R. Doc. 64502-3 ¶¶ 16–29 Kinsella and BrownGreer, PLC ("BrownGreer") worked together to implement the Notice plan. R. Doc. 64526.

Despite Herculean efforts, the number of filed claims remained low, with only 3,137 claims filed by February 16, 2014 for an average of 131 claims filed per week. To boost the number of filed claims, at the suggestion of the Court, the parties authorized BrownGreer to implement a Courtesy Reminder Campaign on February 12, 2014. Pursuant to this campaign, BrownGreer contacted claimants who previously indicated that they might be potential consumer claimants. These efforts included direct mailings to claimants; emails to law firms who represented claimants; emails to claimants who had started the electronic form, but had failed to complete the form; emails to claimants who had registered for Secure Claims Portal access, but had not started a Claim Form; and direct mailing to claimants who had requested and were sent a hard copy of the form, but had not completed a Claim Form. Moreover, BrownGreer enhanced the call center by offering live operator call-backs, Spanish recorded messages, and Spanish-speaking representatives. Finally, BrownGreer augmented the website's capabilities by adding an electronic Claim Form and a mailed Claim Form request on the homepage; a "Do I Qualify for Payment" feature, which would ask potential claimants pointed questions to determine their eligibility; a Spanish Claim Form; and offering a Spanish version of the website.

These efforts were largely successful. The average number of claims per week increased from 131 per week to 312 per week. By the time the claims period concluded on May 6, 2014, a

total of 8,757 claims had been filed, with 5,620 claims having been filed after the implementation of the Courtesy Reminder Campaign.

Of the 8,757 claims filed, BrownGreer deemed 2,284 claims to be ineligible. These determinations broke down as follows: 308 claimants provided no documents, 238 claimants included invalid documents, 314 claimants submitted an incomplete claim form, 916 were determined ineligible for multiple reasons, 110 were excluded, and 398 were found to be duplicates—they had filed more than one claim form. During Orran Brown, Sr.'s presentation to the Court on December 16, 2014, Mr. Brown explained that most of those claims deemed "excluded" had either signed a release form in the Vioxx Personal Injury Settlement or were Missouri residents and, therefore, excluded from the Consumer Class by agreement of the parties.

In an effort to cure the ineligible claimant's problematic documentation and forms, BrownGreer issued a notice to those claimants. BrownGreer sent emails to the claimants who had filed electronically and paper notices to claimants who had submitted hard copy claims. The notices instructed the ineligible claimants to submit the missing documentation and/or forms within thirty days and included an email address and toll free number to contact if the ineligible claimants had questions.

BrownGreer issued the first notice on August 22, 2014 and received 690 responses, a 29% response rate, of which 83% cured their problematic claims. The second notice went out on October 23, 2014, and BrownGreer received 344 responses, constituting a 20% response rate. Eighty-four percent of those responses cured their ineligible claims.

The final period to cure any deficient claims has closed. According to BrownGreer, there are 7,366 payable claims, 988 ineligible claims, and 403 duplicate claims. The final number of

claims totals 8,757. At this stage in the litigation, Plaintiffs agree Merck has met all of its

obligations under the Settlement Agreement, and all claimants have been paid. Consumer Class

counsel spent $1,667,140.09 on Kinsella Media Notice Costs and $1,552,595.62 on claims

administration fees and expenses. Law firms who worked on the Consumer Class claims were

reimbursed $185,580.91 for expenses. The total amount paid to eligible claimants was

$698,767.22. It is now appropriate to determine a fair fee for the attorneys who performed

common benefit work.

Section 14 of the Settlement Agreement sets forth fees and expenses of Class Counsel

and other counsel for the consumer class settlement. R. Doc. 64501-3 at 21–22. Pursuant to that

section,

> Counsel for the Settlement Class, and any other counsel with a basis
> to seek the payment of fees and litigation expenses incurred in
> connection with the litigation of the consumer claims and related
> putative consumer class action cases involving Vioxx, may apply to
> the Court for an award of fees and expenses to be paid from the
> Common Fund in a total aggregate amount for all such counsel not
> to exceed 32% of the maximum of up to $23 million Settlement
> Amount (or an aggregate maximum amount of up to $7,360,000) . .
> . . The actual award of fees and litigation expenses to Class Counsel
> or to any other counsel shall be made by the Court following an open
> and transparent process, including a hearing before the Court open
> to the public and all Class Members.

*Id.*

On September 23, 2015, the Court issued Pretrial Order 59, R. Doc. 65267, which

appointed the Common Benefit Fee and Cost Committee ("Fee Committee"), consisting of

attorneys who worked on this aspect of the litigation—some of whom were on the PSC—and

established guidelines for common benefit attorneys' fees and cost reimbursement. The Court

tasked the Fee Committee with reviewing time and expense applications from any attorney

seeking costs or fees in connection with the Consumer Class claims. Attorneys seeking fees in

this matter were instructed to submit a Fee Affidavit to Phillip Garrett's Case Cost Management System. Twelve such affidavits were submitted. These twelve applicants appeared before members of the Fee Committee and provided an explanation of their requested fees and expenses, as well as how their efforts contributed to the common benefit of the Consumer Class.

On January 3, 2017, the Fee Committee unanimously recommended "that the entire amount of the common fund, less expenses reimbursed by the Court, be made available for the award of attorneys' fees." In reaching this decision, the Fee Committee considered the "entire history" of the Consumer Claims, including the years engaged, the complexity of the issue, the risks and efforts undertaken by counsel, and the number of claimants involved. After reaching this agreement, the Fee Committee filed the instant Motion seeking a Court Order setting attorneys' fees at the maximum amount allowed under the Settlement Agreement. Because the Court previously disbursed expenses in the amount of $185,580.91, the Fee Committee seeks a fee award of $7,174,419.09. R. Doc. 65491 at 4. The Court heard oral argument on the Motion on March 15, 2017. R. Doc. 65516. At that time, the record reflected that the attorneys reported they spent a total of 9891.29 hours performing common benefit work. They now claim that the previously reported hours were inaccurate and that the true total is 14,134.89. Based on this new total, some interest attorneys suggest the initial requested fee should be increased.

## II.     Notice of Objection to Motion for Attorney's Fees [R. 65497]

The sole objection[1] to the Fee Committee's first Motion and presumably also to the new request comes from a pro se consumer, Geneva Meloy, who is a member of the subject class. R. 65497 at 1. She objects to the fee proposal because she cannot verify the reasonableness of the lodestar because the fee declarations are sealed, and believes the Fee Applicants are requesting

---

[1] Merck previously filed an objection, R. 65503, but on March 7, 2017, filed a Motion to Withdraw its objection, R. Doc. 65514.

fees for "duplication of effort and unnecessary work." R. 65497 at 1. In addition, she argues extraordinary effort was not required because the primary personal injury MDL had already settled, and the low claims rate justifies a lower fee than requested. R. 65497 at 2. No objections have been filed in response to the subsequently filed additional hours.

## III.    DISCUSSION

### A.    Procedure

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." FED. R. CIV. P. 23(h). First, "[a] claim for an award must be made by motion under Rule 54(d)(2) . . . at a time the Court sets. Notice of the motion must be served on all parties and . . . directed to class members in a reasonable manner." FED. R. CIV. P. 23(h)(1). Rule 54 establishes that such a motion is timely if made in accordance with deadlines established in a court order.

Here, the Fee Committee has met the procedural requirements. The Aggregate Fee Petition was timely, as it complied with the amended deadlines first established in Pretrial Order 59(A). In the motion, the Fee Committee references the applicable grounds for the award, provides the amount sought, and describes the applicable terms of the portion of the Settlement Agreement that outlined the procedure for determining fees related to the Consumer Class claims. The motion was filed publicly, and the Court heard argument from the parties during a hearing that was open to the public and all Class Members, as contemplated in Section 14.1 of the Settlement Agreement. The Court has received only a single opposition to the motion, even though the motion was filed on January 20, 2017, nearly two months prior to the March 15, 2017, hearing date. There have been no objections to the additional time submissions.

## B. Fairness, Reasonableness, & Adequacy

Attorneys' fees and costs, authorized by law or the parties' agreement, must be reasonable. FED. R. CIV. P. 23(h). "The decision of an award of attorney fees in a common-fund case is committed to the sound discretion of the trial court, which must consider the unique contours of the case." Manual for Complex Litigation § 14.121 (4th ed. 2004). As this Court indicated in its opinion in the personal injury aspect of the Vioxx litigation,[2] courts have increasingly utilized a percentage award to determine attorneys' fees in cases with a common benefit fund. The percentage method provides more predictability to attorneys and class members or plaintiffs, encourages settlement, and avoids protracted litigation for the sake of racking up hours, thereby reducing the time consumed by the court and the attorneys. *See* Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar CrossCheck: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases,* 18 GEO. J. LEGAL ETHICS 1453, 1456–57 (2005) (citing *In re Activision Sec. Litig.,* 723 F. Supp. 1373, 1378 (N.D.Cal.1989)); *accord In re Diet Drugs,* 582 F.3d 524, 540 (3d Cir. 2009).

Furthermore, the United States Supreme Court has approved the percentage method in common fund cases, but has never formally adopted the lodestar method in common fund cases. *See Camden I Condo. Ass'n v. Dunkle,* 946 F.2d 768, 773–74 (11th Cir. 1991) (interpreting *Blum v. Stenson,* 465 U.S. 886, 900 n.16 (1984), as the Supreme Court's "acknowledgment" of the percentage method in common fund cases); *In re Prudential–Bache Energy Income P'ships Sec.*

---

[2] The popularity of this method gained momentum following the publication of the aforementioned Third Circuit Task Force report in 1985. Recognizing the "contingent risk of nonpayment" in such cases, courts have found class or lead counsel ought to be compensated "both for services rendered and for risk of loss or nonpayment assumed by carrying through with the case." *In re Combustion, Inc.,* 968 F. Supp. 1116, 1132 (W.D. La. 1997) (summarizing the various methods used to calculate attorneys' fees); *see In re Cabletron Sys., Inc. Sec. Litig.,* 239 F.R.D. 30, 37 (D.N.H. 2006) (stating that the percentage method "allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure") (quotation omitted); *see also* Samuel R. Berger, *Court Awarded Attorneys' Fees: What is 'Reasonable'?,* 126 U. Pa. L. Rev. 281 (1977). *In re Vioxx Prod. Liab. Litig.*, No. 11-1546, 2013 WL 5295707, at *2–3 (E.D. La. Sept. 18, 2013).

*Litig.,* MDL No. 888, 1994 WL 150742, (E.D. La. Apr. 13, 1994) (tracing the history of the various methods).

Although the Fifth Circuit has not explicitly endorsed a pure percentage method, it has approved the use of a blended method when determining attorneys' fees in common benefit cases. *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir. 2012). In *Union Asset Management Holding*, the Fifth Circuit announced:

> To be clear, we endorse the district courts' continued use of the percentage method cross-checked with the *Johnson* factors. We join the majority of circuits in allowing our district courts the flexibility to choose between the percentage and lodestar method in common fund cases, with their analyses under either approach informed by the *Johnson* considerations.

*Id.* Thus, the Fifth Circuit approves use of the percentage method, so long as the Court also applies the *Johnson* framework to ensure that the fee awarded is reasonable. *See id.; Strong v. BellSouth Telecomms., Inc.,* 137 F.3d 844, 851–52 & n.5 (5th Cir. 1998); *Forbush v. J.C. Penney Co.,* 98 F.3d 817, 823–25 (5th Cir. 1996).

Accordingly, district courts in this Circuit have frequently applied a "blended" percentage method to determine a reasonable fee award, while staying within the *Johnson* framework. *See, e.g.*, *In re OCA,* 2009 WL 512081, at *19; *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 586 F. Supp. 2d 732, 766, 778 (S.D. Tex. 2008); *Turner v. Murphy Oil USA, Inc.,* 472 F. Supp. 2d 830, 859–61 (E.D. La. 2007); *In re Bayou Sorrel Class Action,* No. 04-1101, 2006 WL 3230771, at *3 (W.D. La. Oct. 31, 2006); *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7–12 Litig.,* 447 F. Supp. 2d 612, 628–29 (E.D. La. 2006); *Batchelder v. Kerr–McGee Corp.,* 246 F. Supp. 2d 525, 531 (N.D. Miss. 2003); *In re Combustion, Inc.,* 968 F. Supp. at 1135–36; *In re Catfish Antitrust Litig.,* 939 F. Supp. 493, 499–501 (N.D. Miss. 1996). *In re Vioxx Prods. Liab. Litig.,* 760 F. Supp. 2d 640, 651–52 (E.D. La. 2010).

The Court finds the blended percentage approach for calculating reasonable common benefit attorneys' fees is also the appropriate method for determining attorneys' fees in the Consumer Class aspect of this litigation. As such, the Court will (1) "determine the valuation of the benefit received by the claimants and then select an initial benchmark percentage," (2) "determine whether the benchmark should be adjusted based on the application of the *Johnson* factors to the particular circumstances of this case," and (3) "conduct a rough lodestar analysis to cross-check the reasonableness of the percentage fee award." *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 652 (E.D. La. 2010). The Court notes, however, that "[t]he lodestar analysis is not undertaken to calculate a specific fee, but only to provide a broad cross check on the reasonableness of the fee arrived at by the percentage method." *Id.*

### 1.    Value of Benefit & Benchmark Percentage

As an initial matter, the Court must determine the value of the benefit received by the claimants. Here, the Class Settlement was "a Common Fund settlement with a maximum payment by Merck of up to $23 million." *In re Vioxx Litigation* Settlement Agreement Related to Consumer Class Actions, at 5. The Court established a Common Fund Escrow Account, where Merck made an initial deposit of $6 million. The Settlement Agreement provided that Merck would make additional deposits "to the extent necessary to pay valid Class Member claims." *Id.* at 7. However, the amount actually paid to claimants was much lower than the total settlement amount, as only $698,767.22 was disbursed to Plaintiffs.

In *Boeing Co. v. Van Gemert*, the United States Supreme Court explained that in common benefit cases, the plaintiffs' "right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 480 (1980).

Although the Fifth Circuit has not issued a bright line rule establishing how to calculate the value of the benefit to plaintiffs in common fund cases, it has interpreted *Boeing* to stand for the proposition that "an attorney who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole, including the unclaimed portion." *Strong*, 137 F.3d at 852. In *Strong*, class members alleged the defendants violated antitrust laws by automatically enrolling all customers in a service plan unless the customer affirmatively opted out. *Id*. at 847. In the relevant portion of the settlement agreement, consumers were given the right to withdraw from the plan and receive a statement credit for any amounts they had already paid for the service, or to continue their enrollment with the plan. *Id*.

When addressing attorneys' fees, class counsel in *Strong* argued they were entitled to a percentage of the maximum settlement amount assuming every customer had chosen to opt out of the agreement and receive the statement credit. *Id*. Instead, the district court focused on the actual amount received by the plaintiffs after reviewing the facts and circumstances of the case. In particular, the court explained that the settlement agreement did not establish a common benefit fund, but provided only coupon like benefits. *Id*. at 851–53. Further, the Court emphasized the attorneys had already received a fee above the lodestar and were seeking a multiplier. On appeal, the Fifth Circuit recognized that *Boeing* requires attorneys' fees to be calculated as a percentage of the entire settlement amount, but held that given the "atypical circumstances of this case, the district court did not abuse its discretion in considering the actual results of the settlement." *Id*. at 853. Thus, although the Fifth Circuit has upheld an award based on the percentage of a settlement actually paid to plaintiffs, it also recognizes that, in consumer common fund cases, generally attorneys' fees should be a percentage of the entire available settlement amount and not just of the amount paid to the plaintiffs.

Additionally, courts outside the Fifth Circuit have interpreted *Boeing* as requiring attorneys' fees to "be awarded on the basis of the total funds made available, whether claimed or not." *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d. Cir. 2007); *see also Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295 (11th Cir. 1999) (affirming district court's decision to award attorneys' fees as a percentage of the entire settlement amount, rather than only the amount disbursed to plaintiffs); *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (holding that "the district court abused its discretion by basing the fee on the class members' claims against the fund rather than on a percentage of the entire fund or on the lodestar").

The Sixth Circuit recently addressed this issue, explaining that the best method for determining the "total benefits to the class" is by conducting a case-by-case evaluation. This approach allows a district court to discern the true benefit bestowed on the plaintiffs based on the length and complexity of the litigation. *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 286 (6th Cir. 2016), *cert. denied sub nom. Blackman v. Gascho*, 137 S. Ct. 1065 (2017). In reaching this decision, the Sixth Circuit reasoned:

> Consumer class actions, furthermore, have value to society more broadly, both as deterrents to unlawful behavior—particularly when the individual injuries are too small to justify the time and expense of litigation—and as private law enforcement regimes that free public sector resources. If we are to encourage these positive societal effects, class counsel must be adequately compensated— even when significant compensation to class members is out of reach (such as when contact information is unavailable, or when individual claims are very small). An inflexible, categorical rule neglects these additional considerations.

*Id*. at 287.

While this Court does not endeavor to adopt a categorical rule based on either approach (i.e. fee based on the available amount or on the amount actually paid out), it finds each approach should be considered when determining the value of the Vioxx Consumer Class settlement. In

this case, the "total funds made available" were $23 million. *See Master*s, 473 F.3d at 437. "To fully discharge its duty to review and approve class action settlement agreements, a district court must assess the reasonableness of the attorneys' fees." *Strong*, 137 F.3d at 849. This necessitates a discussion of whether the maximum settlement amount is a reasonable measure of the "total benefits to the class" in this particular case.

Here, Consumer Class counsel worked diligently to reach a settlement agreement that would fully compensate Plaintiffs for their damages. Plaintiffs in the Consumer Class who had documented evidence indicating they had taken Vioxx were entitled to full reimbursement for all costs spent on the drug. In addition, any individual who had incurred medical expenses in relation to obtaining their Vioxx prescription was entitled to reimbursement of up to $75.00 for these expenditures. *See* Settlement Agreement; R. Doc. 64501-3 at 8. For example, if a Plaintiff was required to complete an additional medical exam to find a replacement drug after Vioxx was taken off the market, the cost of this exam could be recovered from the settlement fund up to $75.00. Even if a Plaintiff did not have proof they took the drug, but had documentary evidence indicating they received a prescription, they were entitled to some relief. The $23 million settlement amount was reached after Defendant and Plaintiffs laboriously considered the potential costs of these consumer class claims. However, the ultimate dollar amount paid to Plaintiffs was much less than the amount Merck had agreed to set aside for claimants. Thus, it is necessary to evaluate which amount is a better measure of the benefit to Plaintiffs—the amount available for Consumer Class claims, or the amounts actually paid to claimants.

Answering this question requires an understanding of how the Consumer Class claims fit within the larger context of the Vioxx litigation. This MDL was certified on February 16, 2005. The parties reached a settlement on the Consumer Class claims in 2012—more than seven years

after the inception of this litigation. Through no fault of claimants or class counsel, the

Consumer Class claimants were addressed later in the litigation. This delay probably caused a

lack of interest among Consumer Class Plaintiffs. Additionally, many of the claimants in the

Consumer Class were only entitled to small reimbursements, which may have provided an

insufficient incentive to the claimants to conduct the necessary search to find documentary

evidence of their having taken the drug. However, this does not undermine the total benefits to

which class members were entitled or to which society benefitted from the deterrent effect of this

settlement. As the United States Court of Appeals for the Third Circuit explained, "There are a

variety of reasons that settlement funds may remain (unpaid) . . . Class counsel should not be

penalized for these or other legitimate reasons unrelated to the quality of the representation they

provided." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013).

Further, the Court finds that Consumer Class Claims are unique within the world of class

actions. These claims are often brought pursuant to state consumer protection statutes, and by

aggregating them into a class, Plaintiffs are able "to pool claims which would be uneconomical

to litigate individually." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). "In enabling

small-claim suits, class actions expose the defendants to the risk of liability and thereby deter

them from engaging in wrongdoing in the first place. [This] compensatory mechanism thereby

serves a deterrent function." Newberg on Class Actions § 1:8 (5th ed.). The importance of a

deterrent function is also seen in other areas of the law. For example, it is seen in civil rights

cases or equal protection or race or sex discrimination cases where little is received in terms of

monetary damages, but great benefits result to society as a whole. *See, e.g.*, *Blanchard v.*

*Bergeron*, 489 U.S. 87, 96 (1989) ("Congress has elected to encourage meritorious civil rights

claims because of the benefits of such litigation for the named plaintiff and for society at large,

irrespective of whether the action seeks monetary damages."); *Hensley v. Eckerhart*, 461 U.S. 424, 442–43 (1983) (Brennan, J., concurring). The Settlement Amount in this case not only provided a direct benefit to class members in the form of compensation, but also benefits both class members and the general public, as the settlement amount deters future misconduct. In this case, unlike in the typical personal injury case, to base attorneys' fees solely on the amount paid to claimants would completely disregard these other substantial benefits. Therefore, the Court finds that, in this case, the maximum amount of the settlement fund, $23 million, is the appropriate amount for calculating a reasonable percentage of common benefit fees.

Next, the Court must determine a benchmark percentage. The Court must not simply rubber-stamp the figure proposed by class counsel, but instead attempt to arrive at an independent and justified reasonable percentage that is appropriate under the specific circumstances presented in the case. Courts routinely use empirical studies of attorneys' fees in class action settlements when computing the appropriate benchmark percentage. *See, e.g.*, *Turner v. Murphy Oil USA, Inc.,* 472 F. Supp. 2d 830, 863 (E.D. La. 2007). As this Court has previously discussed:

> [D]istrict courts awarded fees over a broad range when they used the percentage-of-the-settlement method . . . with or without a lodestar cross-check and the fee percentages were ascertainable. These fee awards are exclusive of awards for expenses whenever the awards could be separated by examining either the district court's order or counsel's motion for fees and expenses (which was 96 percent of the time). The awards ranged from 3 percent of the settlement to 47 percent of the settlement. The average award was 25.4 percent and the median was 25 percent.
>
> Most fee awards were between 25 percent and 35 percent, with almost no awards more than 35 percent. Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Award,* 7 J. Empirical Legal Stud. 811, 833 (2010). The *Manual for Complex Litigation* states that a fee of 25% of a common fund "represents a typical benchmark." *See* Manual for Complex Litigation § 14.121. However, scholars note that "a scaling effect exists, with fees constituting a lower percent of the client's recovery as the client's recovery increases." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An*

*Empirical Study,* 1 J. Empirical Legal Stud. 27, 28 (2004). In other words, the lower the recovery, the higher the percentage.

Here, Class Counsel has requested fees of 32% of the settlement fund, which was the maximum amount the parties agreed to under the settlement agreement. Nonetheless, the Court has a duty to ensure the fee award is reasonable under the facts and circumstances of the case. *Strong*, 137 F.3d at 849. "Even when the parties have reached an agreement on the amount of attorneys' fees," a district court "must scrutinize the agreed-to fees under the standards set forth in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir. 1974), and not merely ratify a pre-arranged compact." *Id.* (internal quotations omitted).

Further, the fee in the Consumer Class claims must be considered in the context of the entire MDL. The attorney fee for the personal injury portion of this case was 6.5% of the MSA, which was $4.85 billion. *In re Vioxx Prod. Liab. Litig.,* 760 F. Supp. 2d 640, 658 (E.D. La. 2010). In reaching this amount, the Court noted that a smaller percentage was justified in light of the substantial settlement amount. *Id.* The Court followed the pattern of scale effect commonly seen in class action litigation—"[a]ttorneys receive a smaller proportion of the recovery as the size of the recovery increases." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements:* 1993–2008, 7 J. Empirical Legal Stud. 248, 279 (2010). Notably, the benefit to Plaintiffs in the Consumer Class settlement was considerably smaller than the benefit Plaintiffs received for personal injury claims in the MSA. Following the reasoning of Eisenberg & Miller, which has been applied in numerous other courts,[3] the percentage of the fee

---

[3] As this Court previously explained, other courts have followed this principle when evaluating appropriate benchmark percentages in class settlements. *See In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.,* 733 F. Supp. 2d 997, 1012–15 (E.D. Wis. 2010); *Murphy Oil,* 472 F. Supp. 2d at 862–64; *In re ETS,* 447 F. Supp. 2d at 630; *Allapattah Servs., Inc. v. Exxon Corp.,* 454 F. Supp. 2d 1185, 1212 (S.D. Fla. 2006); *In re Cabletron Sys.,* 239 F.R.D. at 37 n. 12, 41. The Eisenberg and Miller studies are helpful for providing concrete evidence for the relationship between the amount recovered and the attorneys' fee award; the empirical data shows that as settlement amounts rise, the reasonable percentage of attorneys' fees decreases. Eisenberg & Miller 2004 at 54–55; Eisenberg & Miller 2010 at 263–65.

recovery in the Consumer Class portion of the litigation should be greater than the percentage awarded as a fee in relation to the MSA.

It cannot be ignored, however, that the amount of actual recovery in this case was low—far lower than anticipated. As a result, the Court now faces the unenviable task of determining how to award attorneys a reasonable fee, when any reasonable fee will likely be superior to the funds received by the claimants. First, it is undeniable that the temporal delay in addressing these claims resulted in decreased participation in the Consumer Class claims. Individuals may have no longer had access to the documentation to recover these funds, they may have been unmotivated by the relatively small individual recovery amounts, or they may have simply forgotten. In any event, the decreased interest was in no way attributable to the significant efforts of class counsel. To the contrary, class counsel continuously employed innovative and diligent methods to ensure claimants had every opportunity to pursue their claims. The consumer claims were aggressively handled by competent attorneys. Notice was creative and painstaking—using groundbreaking methods such as social media and translation services to reach as wide an audience as possible.

Second, it is important to note that any remaining funds will revert to Defendant, the tortfeasor in this case. Given that fact, Defendants will benefit both directly and indirectly if a small fee is awarded. Defendants would receive a direct benefit in that any money not paid to counsel will revert back to them. Defendants would indirectly benefit if Consumer Class counsel receive a small fee, as an insufficient fee will serve to deter future attorneys from taking on these types of claims. As one commenter noted "limiting counsel to a percentage of the class's actual recovery in a claims-made or reversionary fund situation is likely to disgorge significantly less

_____

money overall, providing *defendants* with what might be characterized as a windfall. All things being equal, it seems more defensible that class attorneys, rather than defendants, receive the excess." Newberg on Class Actions § 15:70 (5th ed.). On the other hand, it must be noted that no depositions were taken, only a limited number of motions were argued, and there were no trials. Most of the work in the consumer aspect of this litigation was of a clerical nature, such as obtaining documents, drafting and distributing the notice and recording the responses. The most important function, and the one which produced the benefit to the class, was the negotiation of the settlement. This took time, effort, and skill.

In light of the foregoing, and guided by this Court's observations over the last twelve years of the nature and scope of the work and effort of those attorneys who worked on the Consumer Class cases and settlement, the Court finds that 18.5% of the total available settlement amount is a reasonable benchmark percentage for a common benefit fee award in this case. This figure is more than double the percentage awarded as a fee in the personal injury cases; however, the Consumer Class settlement of $23 million was significantly smaller than the $4.85 billion MSA and necessitates a higher percentage to ensure a reasonable fee. This figure is within the range of similar MDL awards and assessments. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008,* 7 J. Empirical Legal Stud. 248, 262 (2008) (explaining that the mean percentage fee in consumer class cases is 25%, with a median fee of 20%). No part of this 18.5% will come from the recovery of any Vioxx claimant; rather, it will be assessed directly against the funds Merck set aside as part of the Consumer Class settlement. It is now appropriate to test this percentage in the crucible of the *Johnson* factors to determine whether an adjustment, upwards or downwards, is in order.

## 2. *Johnson* Framework

In awarding attorneys' fees and costs, the Court must employ the *Johnson* framework as the basis of its analysis; it must not proceed in a summary fashion, and it must set an amount that "can be said to be just compensation." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.,* 669 F.3d 632, 642 (5th Cir. 2012). The *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.,* 669 F.3d 632, 642 n. 25 (5th Cir. 2012) (citing *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974), *overruled on other grounds by Blanchard v. Bergeron,* 489 U.S. 87 (1989)).

The initial recorded hours submitted to the Court-appointed CPA totaled 9,891.49; the amended submission added nearly 5000 additional hours for a total of 14,134.89 hours. Nevertheless, when scrutinized, some of the new submissions become questionable, not necessarily because the hours were not worked, but because the work was not in aid of the consumer case or because these hours were not contemporaneously logged or were otherwise not submitted in accordance with the Court's pretrial orders. After a careful analysis, and drawing on the Court's close supervision of this portion of the litigation, it concludes a more appropriate and accurate representation of the number of hours performed by class counsel which contributed to the ultimate result is between 10,000 and 10,500. Accordingly, the Court will utilize 10,200 hours as an appropriate measure of time to utilize in this cross check analysis.

The consumer portion of the litigation spanned more than twelve years, and counsel worked diligently throughout that time to develop these claims. Second, the Consumer Class involved claims based on forty-four state consumer protection statutes. Thus, Class Counsel had to evaluate the claims under multiple different state laws, increasing the complexity of the case. *See* R. Doc. 790 at 60–75. They demonstrated industry and ability through intensive discovery and pretrial efforts, as well as briefing and arguing several discovery and dispositive motions that contributed to the global settlement. Third, considerable skill was required of counsel in this case, both in coordinating the litigation, contacting claimants, assisting them in locating prescriptions and other medical documentary evidence, as well as negotiating an advantageous settlement. Fourth, the number of potential class members was uncertain at the time this action was filed, requiring counsel to remain unencumbered by other obligations for an extensive time period. Fifth, the fee here, as noted above, is within the range of fees in other, similar actions. Sixth, the fee is contingency-based, and counsel risked the possibility of no recovery whatsoever. Seventh, the circumstance of this case certainly created temporal limitations, as a substantial amount of time passed between when Plaintiffs took the drug and when they were able to pursue their Consumer claims. Eighth, the amount of each individual's recovery was relatively low, and there was a possibility that no recovery would be obtained. Ninth, the attorneys here had significant experience, strong reputations, and adequate ability. Tenth, the relatively low amounts involved and uncertain class size made the case relatively undesirable. Eleventh, counsel was actively engaged with the Class Representative throughout the litigation and, to a lesser extent, also engaged with the other Class Members. Twelfth, the award allows those claimants who fully participated in the settlement to recover all of their costs associated with the prescription drug Vioxx.

### 3.      Lodestar Cross Check

The Court must next conduct a lodestar cross check to determine the appropriateness of the benchmark percentage in this case. "In recognition of the noted disadvantages of the lodestar method as the principle means for determining attorneys' fees, such as the taxing of judicial resources by examining every time entry and billing rate for each attorney, a lodestar analysis which is rough and more abbreviated is appropriate for a cross check." *Turner v. Murphy Oil USA, Inc.,* 472 F. Supp. 2d 830, 867 (E.D. La. 2007).

The Court-appointed CPA reports that the vetted and approved hours spent by counsel on common benefit work on the consumer aspect of the case total 10,200 hours. *See* Phillip Garrett's Case Cost Management System Report from November 2004 to June 2018. Eighteen and one-half percent of the total amount of the settlement equals $4,255,000, which results in an hourly fee of $417.16. Class Counsel did not provide individual billing rates by the Fee Committee members; however, the Court has previously relied on an average hourly rate of $443.29 per hour for attorney rates in Vioxx personal injury litigation. *See In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 600 (E.D. La. 2011). While the hourly rate in the Consumer Class is lower than the hourly rate awarded in the personal injury portion of this MDL, the Court finds a rate of $417.16 is adequate. In particular, the Court notes that the lower hourly rate is justified in light of the lower amounts actually received by Plaintiffs in the Consumer Class and the fact that no depositions or trials occurred in this aspect of the MDL. Thus, a fee of 18.5%, or $4,255,000 appears to be reasonable. The reasonableness of the fee in this case is made even more apparent when one considers that it was contingent, that it is paid by Defendant not the claimants, and that if not paid to Plaintiffs' counsel, it would revert to the tortfeasor.

Nevertheless, there will undoubtedly be those who read this opinion, focus on the fact that the attorneys will receive more money than the litigants, and criticize this result as being unfair. Such criticism cannot prevail over the unvarnished truth that there are certain principles, the true value of which cannot be measured by or contingent upon the amount of monetary recovery received to secure them. Justice and fairness are certainly two of those principles. In the present case, to allow innocent consumers, many of whom are elderly, uneducated, and unsophisticated, to be taken advantage of simply because the amount each has lost is too small to allow them to hire an attorney is simply unfair and unjust. To remedy this situation, it is appropriate to adequately compensate and thereby encourage counsel who don the cudgels to right this wrong. That is the intent and goal of this opinion.

## IV.     CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the Common Benefit Fee and Cost Committee Motion for Aggregate Fee Petition, R. Doc. 65491, is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Class Counsel is awarded attorneys' fees of $4,255,000 or 18.5% of the $23,000,000 settlement fund, which amount should be placed in the registry of the Court within three weeks. Thereafter, the Court will conduct future proceedings to determine the distribution of the fee among the attorney applicants.

New Orleans, Louisiana, this 26th day of September, 2018.

UNITED STATES DISTRICT COURT JUDGE