UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  VIOXX PRODUCTS          *      05-MD-1657
        LIABILITY LITIGATION    *
                                *      Section L
                                *
Relates to:  All Cases          *      September 11, 2018
* * * * * * * * * * * * * * * *


ORAL ARGUMENT BEFORE
THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE


Appearances:


For the Fee Committee:          Herman Herman & Katz, LLC
                                BY:  RUSS M. HERMAN, ESQ.
                                     LEONARD A. DAVIS, ESQ.
                                820 O'Keefe Avenue
                                New Orleans, Louisiana 70113


For the Fee Committee:          Barrios Kingsdorf & Casteix, LLP
                                BY:  DAWN M. BARRIOS, ESQ.
                                701 Poydras Street, Suite 3650
                                New Orleans, Louisiana 70139


For the Fee Committee:          Lieff Cabraser Heimann
                                  & Bernstein, LLP
                                BY:  ELIZABETH J. CABRASER, ESQ.
                                275 Battery Street, 29th Floor
                                San Francisco, California 94111


For the Fee Committee:          The Getty Law Group, PLLC
                                BY:  RICHARD A. GETTY, ESQ.
                                250 West Main Street, Suite 1900
                                Lexington, Kentucky 40507

Appearances:

For the Fee Committee:          Law Offices of James P. Lyle, P.C.
                                BY:  JAMES P. LYLE, ESQ.
                                1116 2nd Street, N.W.
                                Albuquerque, New Mexico 87102


For Certain Plaintiffs:         Oldfather Law Firm
                                BY:  ANN B. OLDFATHER, ESQ.
                                1330 S. Third Street
                                Louisville, Kentucky 40208


For Certain Plaintiffs:         Whitfield Bryson & Mason, LLP
                                BY:  GARY E. MASON, ESQ.
                                5101 Wisconsin Ave. NW, Suite 305
                                Washington, DC 20116


For Certain Plaintiffs:         Johnson & Perkinson
                                BY:  DENNIS JOHNSON, ESQ.
                                Post Office Box 2305
                                South Burlington, Vermont 05407


Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                500 Poydras Street, Room B-275
                                New Orleans, Louisiana 70130
                                (504) 589-7778



Proceedings recorded by mechanical stenography using
computer-aided transcription software.

**INDEX**

                                                    Page

Oral Argument
        Leonard A. Davis, Esq.                       14

        Elizabeth J. Cabraser, Esq.                  21

        Ann B. Oldfather, Esq.                       26

        Dennis Johnson, Esq.                         33

        Russ M. Herman, Esq.                         35

        Richard A. Getty, Esq. (via phone)           39

        Gary E. Mason, Esq. (via phone)              43

        Elizabeth J. Cabraser, Esq.                  45

        Ann B. Oldfather, Esq.                       47

**PROCEEDINGS**

**(September 11, 2018)**

1

2

3      **THE COURT:**  Be seated, please.  Good morning, ladies

4 and gentlemen.

5           Call the case, please.

6      **THE DEPUTY CLERK:**  MDL 1657, *In re Vioxx Products*

7 *Liability Litigation*.

8      **THE COURT:**  Counsel make their appearance for the

9 record.

10      **MR. HERMAN:**  May it please the Court.  Good morning,

11 Your Honor.  Russ Herman for the fee committee.  I believe

12 Mr. Getty is on the phone.  Mr. Lyle is here.  The co-chair and

13 also --

14      **MS. CABRASER:**  Good morning, Your Honor.

15      **MR. HERMAN:**  The class co-chair, Elizabeth Cabraser,

16 is here, Dawn Barrios --

17      **MS. BARRIOS:**  Good morning, Your Honor.

18      **MR. HERMAN:**  -- Lenny Davis --

19      **MR. DAVIS:**  Good morning, Your Honor.

20      **MR. HERMAN:**  -- and, of course, Ann Oldfather.

21      **MS. OLDFATHER:**  Good morning, Your Honor.

22      **THE COURT:**  Good morning.

23      **MR. HERMAN:**  Also, Mr. Johnson is here.

24      **MR. JOHNSON:**  Hello, Your Honor.

25      **THE COURT:**  Let me mention just a couple of things by

09:03  1  way of background.

2  First, an announcement:  My law clerk, Sheridan

3  DuPont, is leaving me.  She is going to the Fifth Circuit.  As

4  I say, she is leaving the search for truth and now beginning a

5  search for error.  She will be with the circuit.  I want to

6  thank her for all of her work.  She has done a great job for

7  me.

8  I probably should go into the background not

9  only to put the matter in perspective, but these matters tend

10  to last a long time.  I don't have any permanent clerks, so I

11  am the only institutional memory in the cases.  I try to take

12  as much time as I can to at least go into some of the

13  background so that my new clerks can understand what's been

14  happening.

15  I won't be too long, but just by way of

16  background and to put this matter in perspective, we should

17  note that on February 16, 2005, *Vioxx* MDL 1657 was created and

18  sent to this Court for handling.  The case proceeded and there

19  were a number of factors involved in the *Vioxx* case.

20  First, it involved some 50,000 individuals who

21  claimed that they had a difficulty, heart problems and stroke,

22  resulting from the consumption of Vioxx.

23  In addition to that, I had a number of European

24  class actions.  People in France, Germany, and Italy claimed

25  that they also had problems and filed class actions indicating

1    that they were entitled to recovery.

2                   In addition to that, we had some 20 states that

3    the attorneys general filed suits claiming that they were

4    entitled to recover their Medicaid payments back because they

5    were misled because of Vioxx.

6                   In addition, there were miscellaneous injuries,

7    DVTs and other injuries.  Some claimed muscular injuries.  Some

8    claimed cancer-producing problems resulting from Vioxx.

9                   Finally, we had the consumer claims.  The

10   consumer claims posed an interesting question.  These were

11   individuals who did not fall into any of the other categories.

12   They did not have any malady created by Vioxx.  They did not

13   have any complaint of Vioxx, at least when they took it.  Some,

14   frankly, were angry that Vioxx was taken off the market because

15   they felt it was a helpful drug to them.

16                   In considering the matter, they concluded that

17   had they known that Vioxx was potentially problematic, they

18   would not have purchased Vioxx.  Instead, they would have

19   purchased something else because they were having

20   musculoskeletal problems.  They would have taken something like

21   aspirin, Tylenol, or something else to help them rather than

22   subject themselves to risks.  They felt that they were entitled

23   to receive their money back for what they felt was misleading

24   advertising or something that produced a risk that they didn't

25   want.

09:07

1     There are many good things about MDLs -- I

2 think, anyway -- but one of the difficulties is that when one

3 judge gets that kind of case, the only way that you can handle

4 it is to prioritize it and get one bite of that elephant at a

5 time.  That's how you eat an elephant, one bite at a time.  I

6 prioritized it, and I dealt first with the 50,000 claims -- and

7 they came from every state -- that claimed that they had heart

8 attacks.  We had deaths.  We had a lot of problems with strokes

9 and things of that sort resulting from Vioxx.

10     I put all of my horses, so to speak, on that

11 aspect of the case.  I had some 1,000 preliminary motions,

12 discovery motions, many of which I handled on the phone or at

13 least orally and just transcribed my comments.  That was done.

14     We had about six trials.  One we had to move to

15 Houston because of the storm here.  We did about six bellwether

16 cases.  About two and a half years, three years out, those

17 cases, I'm happy to say, were able to be resolved by good work

18 of the committees, by good work of the people on both sides of

19 the V.  The cases were able to be resolved, so I went to the

20 next level.

21     First, I dealt with the European class actions.

22 Most of those I was able to deal with with argument and

23 opinions.

24     When that was finished, I focused on the 20

25 states that presented issues.  Each state was a bit different.

09:09

1   We tried one of those cases, and eventually they began to
2   settle.  Those cases were settled.
3                Then we focused on the miscellaneous injuries,
4   the injuries other than the stroke and the heart attack because
5   those were the only injuries that were resolved.  When I came
6   to that aspect of the litigation, the committee structure posed
7   a problem -- at least in my mind posed a problem -- because the
8   arrangements, particularly of the plaintiffs' committee at that
9   time, were really focused on the heart attack and the stroke
10  cases and they resolved those cases.
11               There was some issue as to whether or not they
12  could resolve or work on the miscellaneous cases.  There was
13  some concern -- expressed by them primarily -- that they felt a
14  little awkward working on the cases that were not settled and
15  people might feel there was some problem or conflict, so I
16  formed another committee.
17               Initially several people stepped forward on that
18  particular committee and were interested in working on the
19  case.  Those are difficult cases.  Although at the beginning
20  there were several people who volunteered and indicated that
21  they were interested in working, I wasn't certain that they
22  would be with us at the end.  Indeed, they weren't.  It looked
23  like, at the end of that miscellaneous work, there was only one
24  lawyer who was standing for those individuals, but those
25  resolved.

09:11

1    That took, frankly, six, eight years to resolve
2    those aspects of the litigation.  The first 50,000, I'm happy
3    to say, were able to be resolved in two to three years, but it
4    took a longer time for the class actions.  It took a longer
5    time for the 20 states.  It took a longer time for the
6    miscellaneous injuries.  Then I focused on the consumer claims.
7    That's a problem with the MDL, and I don't know
8    how to deal with that problem.  As I say, I had to prioritize.
9    The fact is that when you get to these particular claims, it's
10   eight, nine years.  The people who were interested in getting
11   their money back either lost interest or it became problematic
12   for them to do that.  I recognize it.  You try to do the best
13   you can with it.
14   We spent a lot of time on the notice,
15   recognizing that we had people some of whom didn't speak
16   English, and we had to reach out in various ways.  Frankly,
17   over an eight- to ten-year period of time, the methods of
18   communication have changed.  We don't write in the sky anymore.
19   We don't use telephones as much anymore, at least landlines.
20   We have a lot of electronic communication.
21   With the help of the lawyers doing yeoman work,
22   they came up with various methods of trying to communicate to
23   these individuals to seek their claim.  Through their good work
24   and others, those claims were resolved, and the defendants
25   agreed to pay the entire amount that somebody paid for the

09:14

1   drug.  They asked that those individuals produce canceled

2   checks, produce bills, produce pharmacy receipts, anything at

3   all to show that they purchased the drug and paid for the drug

4   and they were entitled to get their money back.

5   Under the terms of the settlement, because Vioxx

6   was a prescribed drug, if they were interested in getting

7   another prescribed drug rather than simply an over-the-counter

8   medication and had to go to a doctor to get a prescribed drug,

9   the defendants agreed that they would pay that fee, that

10   doctor.  So the potential of the claimant was to receive

11   everything that they spent back from the settlement.

12   The difficulty is that they had to produce some

13   proof of payment or some proof of receipt of those drugs.  If

14   they had pharmacy records, that was satisfactory, canceled

15   checks were satisfactory, anything that they could show that

16   they, in effect, paid for the drug.  If you could not do that,

17   if you didn't have that documentation, then you were entitled

18   to $50 simply to show that a doctor prescribed it.  That was

19   sent out noticewise, and we sent several notices out because

20   the cases weren't coming in.

21   I mentioned that this was prioritized, and I

22   recognize that that's part of the problem, and a problem

23   created to a great extent by the Court in getting to this

24   massive type of litigation.  There are people who didn't want

25   to bother with getting the documentation.  They have other

09:16

things to do.  Family changes.  They move.  They lose interest
in it.  They are not interested anymore.  $50, they feel it's
just not worth their time to worry about filing for this or
asking for this or contacting a lawyer for this or whatever.

The long and short of it is the cases did not
come in.  The amount paid out was something like $1 million or
thereabouts.  The settlement, I have forgotten the specifics of
it, but it was up to $20 million or $21 million that was there.
Also, there was an amount that was set that was up to
$7 million for attorneys' fees.

That's what happened in that particular case.
The key people came in.  We kept track of them.  We were
concerned that they were low.  We sent other notices out.  We
sent multimedia notices.  We sent television notices.  We sent
translations in Spanish and in local newspapers and local
periodicals to try to reach people.  Notwithstanding that, as I
say, we got a certain amount, but it fell far short of the
amount available to those individuals.

That's what we did, and those individuals who
claimed the amount, those who were able to show everything they
paid, received everything they paid back.  Those who were not
received the $50 that was available to them.  Added up, that
came to around $1 million, maybe a little less, maybe a little
more.

Then we focused on attorneys' fees.  In these

09:19

1    particular cases, the attorneys' fees generally reflect the

2    amount that is paid out.  I don't have any problem with that.

3    That's generally appropriate.  All of us are familiar with

4    contingent fees.  Contingent fees are contingent on recovery.

5    Generally it's a percentage of recovery.  In the *Vioxx* case,

6    the 50,000, I think the amount was some 6.5 percent of the

7    amount recovered in the case.  That was the attorneys' fees for

8    the people who produced that amount.  It was a percentage.

9              It's a little more problematic from the

10   standpoint of consumer cases because consumer cases generally

11   are small amount recoveries.  I don't mean to disparage the

12   amount.  If you don't spend the money, then you can't get more

13   than you spent in many of those instances.  So those amounts,

14   the individuals' amounts, are meager oftentimes, but added up

15   they are different.

16             Then you come to the point should the attorneys'

17   fee be contingent on the amount recovered.  In most cases that

18   works and that's the way it should be.  I'm a little concerned

19   oftentimes with consumer cases because, frankly, the way the

20   system works is that but for the lawyers' work there would be

21   no consumer recovery.  It's just the facts of life.  The

22   consumers, because they have a small amount of potential, they

23   can't hire a lawyer.  If they are looking for $50 or $100, they

24   can't go knocking on a lawyer's door and say, "Will you take my

25   case?"  It just won't happen.

09:22

1    So lawyers who take these cases do a service, I
2 think, to the consumer and do a service, I think, to the
3 community and to the vitality of the system.  But for their
4 work consumers, unfortunately, would be ripped off and would
5 recover nothing.  I recognize that, and I wrote an opinion
6 setting out the total amount of the fee.
7    What I do with attorneys' fees, first I try to
8 focus on the pie itself, how big is the pie.  When I have
9 decided how big the pie is, then I go to the next stage and
10 decide the slices of the pie, who gets what of the slice.
11    I wrote an opinion dealing with the size of the
12 pie.  I put it out and I had a lot of objections, both from the
13 attorneys and elsewhere, that either the pie was too big or the
14 pie was too small.  Some said that this litigation was
15 different in that there were no trials, this litigation was
16 different in that there were no depositions, there was limited
17 discovery, and that most of the work done was done in a
18 paralegal form or fashion with direction from counsel.
19    There were some complaints by various people
20 that the amount was too big.  Many felt it was too small.  They
21 had up to $7 million and a lot of time was put in on the case;
22 and that when you computed the time, it was too small.  There
23 were others, well, they didn't think there would be any fee; so
24 now that there is a fee, they felt that they were deprived of
25 the appropriate opportunity to send in time, and they felt that

09:24

1    they should be given an opportunity.

2              Because of all of the discussions about that

3    particular opinion, I felt it best to withdraw the opinion and

4    give counsel a second look and deal with it.  We are here today

5    to discuss the size of the pie, in any event.  I haven't

6    decided the slices yet, but the size of the pie.

7              I have now a number of individuals who have

8    claimed time that did not claim time before.  I have other

9    individuals who feel that they have claimed time, that they

10   played by the rules and submitted their time appropriately and

11   timely, and that that should result in closing the amount of

12   time that it took to handle the case.  In any event, we have

13   both the people who filed the time before and the people who

14   filed time since, and I'm here to hear what you have to say.

15             I apologize for being so long-winded, but I

16   wanted at least to put this matter in perspective and to give

17   you some opportunity to view it from that vantage point.  I'll

18   hear from the parties at this time.

19             Russ, do you have anything?  Lenny?

20        MR. HERMAN:  Mr. Davis will address it first, and

21   then at some point in time I may comment.

22        THE COURT:  Okay.  Good.

23        MR. DAVIS:  Good morning, Your Honor.

24             The fee committee that you put together in

25   Pretrial Order 59 -- which included my law partner,

09:26

1   Russ Herman, who was the chair, myself, Ms. Barrios,

2   Ms. Cabraser, Mr. Getty, and Mr. Lyle -- has done considerable

3   work and met, conferred -- telephone conferences,

4   face-to-face -- over time and really takes Your Honor's

5   comments and your orders very seriously.

6           I'll give a little history, although I

7   appreciate your history and your prioritization.  At this point

8   I'm going to limit my comments solely to consumer even though,

9   as Your Honor mentioned, there were many other aspects of this

10  litigation that were ongoing both before and after consumer,

11  including third-party payer, AG, the foreign matters, *pro se*

12  matters, etc.  As I appreciate it, Your Honor wants to limit

13  this discussion to consumer and so I will limit my comments on

14  that.

15          The fee committee does request a reinstatement

16  of an order pertaining to fees, and we think that it is

17  appropriate.  Your Honor vacated that order, which was a

18  $4,025,000 fee, which was Rec. Doc. 65537, dated September 1,

19  2017, which was vacated in Rec. Doc. 65545 just a short time

20  after that, November 17, 2017, which was after a conference

21  that the Court convened.

22          The fee committee is prepared to follow Pretrial

23  Order 59.  Step 1 through Step 4 have been completed with

24  respect to Pretrial Order 59.  The issues that face the fee

25  committee are, as you mentioned, what is the pie and what

09:28

1    should that pie be, and then the next step is how to slice that

2    pie.  The fee committee is prepared to do the second part, but

3    quite frankly needs guidance from the Court with respect to the

4    first part.

5              Your Honor considered originally time that was

6    9,891.49 hours that were reported by Mr. Garrett.  There were

7    also at that time various members or individuals who asserted

8    that they had time in the consumer matter, but that under your

9    order with respect to maintaining and submitting time and

10   expenses, there was not a compartment or bucket, as I will call

11   it, for designating those particular hours or time or expenses

12   that were kept for those various segments of the litigation.

13             Originally individuals made submissions to the

14   Court in the form of affidavits -- some individuals did -- that

15   delineated as best they could those hours.  Your Honor then

16   directed folks to come back and to resubmit hours to

17   Mr. Garrett, which was done, and to delineate those hours that

18   they could attribute to the consumer matter.  In fact, that was

19   done, and Mr. Garrett rendered an updated report on May 23,

20   2018, which had a total of 14,134.84 hours of time in the

21   consumer matter.

22             The consumer settlement, which was a class

23   settlement, provides that the aggregate fee will not exceed

24   32 percent of the maximum of up to the $23 million settlement

25   amount, which was the aggregate.  It came out to $7,360,000,

09:31

1    which was the amount that the settlement provided for a fee,

2    which Merck agreed not to oppose an application for that fee.

3                   As Your Honor is aware and as you mentioned,

4    there were a couple of objectors, but the Garrett report, based

5    on those initial hours of 9,891.49 hours, came out to an

6    aggregate of $406.92 per hour.

7                   Your Honor, we ask that the Court reinstate a

8    fee award, and certainly that's the Court's prerogative.  There

9    are many more hours that are included at this time, but the fee

10   committee understands that the Court had made an award

11   previously and understands that that award was what the Court

12   analyzed.  So at this point what the fee committee asks for is

13   a reinstatement of an award.

14                  We are prepared if Your Honor wants us to

15   address an increase to that award over the amount that was

16   originally provided, the $4,025,000, but certainly some type of

17   an award we believe is appropriate.

18            THE COURT:  You say $23 million was the agreement.

19   That is accurate in that was the amount, but it was understood

20   that the amount had to be claimed.  In other words, the

21   settlement was not to exceed $23 million.  Now, the unfortunate

22   thing is in this particular case only $1 million or thereabouts

23   was paid to the claimants.  You're arguing that the lawyers

24   should get $4 million and the claimants should get $1 million.

25   That is not a percentage of the amount.  That's a percentage

09:33

1  of, what, 400 times the amount that the claimants received.

2  The claimants receive a portion of what the lawyers get, not

3  the lawyers getting a portion of what the plaintiffs get,

4  that's the unfortunate thing in this situation.

5          Now, having said that, the difficulty is that

6  the agreement also provides that the attorneys' fees would not

7  exceed $7 million; and that if the amount was not received by

8  the attorneys, the defendants would get it back.  So you're in

9  a situation where the people who potentially caused the problem

10  get money back, which is not the way the system ought to work.

11  That presents a problem in this particular case too.

12          MR. DAVIS:  Your Honor, you're right on target in

13  that that was the negotiated class settlement.  That negotiated

14  agreement was for the fee that Merck would not oppose up to

15  that amount and so there was consent by Merck as to that.

16  Certainly we would suggest to the Court that Merck not be given

17  back any of the funds and that whatever fee amount Your Honor

18  awards should go to the lawyers for the work that they did,

19  which was a substantial amount of work.

20          You will recall, Your Honor, that we briefed

21  that matter to Your Honor prior to Your Honor's $4,025,000

22  award that addressed the amount of effort that was undertaken

23  by the lawyers to bring this matter to conclusion, and it

24  cleaned up a substantial amount of the matters in this MDL.

25  There was a tremendous amount of effort that was put into it

09:35

1   and, in fact, went through that entire process, through the
2   notice and that.  I won't repeat all of that.
3           A *cy pres* or some type would be appropriate if
4   there's what I call a gap between whatever the Court orders as
5   a fee and the amount which Merck agreed to, the $7,360,000.
6   That would be appropriate for something like that.
7           **THE COURT:**  It would seem to be appropriate, but the
8   circuit hasn't expressed kindness towards *cy pres* in most
9   instances.  Particularly, I would imagine that the defendants
10  would object to it, so you would have one side objecting to it.
11  That doesn't mean anything, but that has to be at least
12  factored into it too.
13          *Cy pres* is, I think, a good opportunity to do
14  something for consumers and do something for that concept.
15  It's unfortunate, however, that the circuit courts don't feel
16  the same way, and maybe for justified reasons.  In any event,
17  that in most instances won't fly if there is an objection.
18  It's just the way the law has developed.
19          I hear you.  How do you feel about the fact that
20  the lawyers are getting 400 times more than the litigants
21  themselves?
22          **MR. DAVIS:**  Your Honor, I think that we outlined the
23  work that the lawyers did to try to bring this to conclusion.
24  In fact, there was a settlement that was out there to which
25  many, many, many, many people had an opportunity to participate

09:37

1   in.  The notice was out there, the efforts were undertaken to

2   get folks to participate, and the opportunities were there.

3             Merck recognized that opportunity, and certainly

4   they did in this settlement.  So that's why this was an agreed

5   upon settlement, the way it was structured, but no one knew how

6   many people would step to the plate to make that claim, as

7   Your Honor mentioned in your earlier discussion.

8             THE COURT:  There were no trials in the case, in the

9   consumer case.

10             MR. DAVIS:  There were no trials.

11             THE COURT:  I know that in Kentucky there was a lot

12   of briefing and a lot of work on that Kentucky case.  It went

13   up.  I think they won the certification below.  I think it was

14   then reversed in the court of appeal, and it was appealed to

15   the Kentucky supreme court for reinstatement.  That was briefed

16   and argued, but I'm not sure what happened there.  In any

17   event, the case was resolved before the supreme court of

18   Kentucky spoke on the matter.  I don't know whether that was

19   tried or not.

20             MR. DAVIS:  Your Honor, co-class counsel,

21   Ms. Cabraser, can give you some more information.

22             THE COURT:  Let me hear from Elizabeth, and then I

23   will take the people on the phone.  I will give you an

24   opportunity to speak too.  Let me hear from Elizabeth.

25             Elizabeth, what's your view on the fact that the

09:39

1    lawyers are receiving more money than the claimants are

2    receiving?  What's your thought there?

3              **MS. CABRASER:**  Your Honor, first we have to say thank

4    you, given your very brief recitation of very comprehensive

5    work that was done by the Court since early 2005 in this

6    litigation and all the benefits of this litigation that have

7    inured to so many people on so many claims across the country.

8    We always say thank you, Your Honor, when we come to court for

9    the rulings we receive and the case management, but in this

10   case I think we have to give special thanks.

11             We understand that MDL judges need to

12   prioritize, and I think Your Honor gave some excellent reasons

13   why.  Claims need to be prioritized.  In one way they are

14   apples and oranges, they can't be compared, but in other ways

15   there are compelling reasons.  In an MDL that includes personal

16   injury and wrongful death claims, signature disease claims and

17   other claims, consumer claims, third-party claims, and all the

18   claims you mentioned, not everything can be first priority in

19   terms of getting the Court's initial attention.  I think this

20   MDL has innovated, it's served as an example, and we have

21   learned from our experiences in this case as well.  We thank

22   the Court.

23             One of the things that we have learned from this

24   case and the consumer cases is how to deal with the claims

25   scenario in a case where for many reasons the claims

09:41

1    opportunity comes years after the initial purchase.  This case

2    had its inception in marketing that occurred before

3    computerization, before computer records.  We were on the cusp,

4    so we faced a number of challenges in trying to maximize

5    claims.

6             With the assistance of the Court, I believe we

7    did the best we absolutely could to do that.  I don't think we

8    left any stone unturned to try to maximize claims.  I think it

9    was the circumstances of the timing, the circumstances of the

10   nature of the claims.  The consumers themselves paid a very

11   small portion of the purchase price of Vioxx as a prescription

12   drug, as Your Honor knows.

13            I think Your Honor touched on a very important

14   point with respect to the consumer claims, and that is the

15   deterrent effect of the consumer statutes.  This settlement was

16   a settlement of the consumer statutes of all of the states.

17   They are statutory claims.  In statutory claims, we don't

18   always look at the fees as a percentage of recovery.  We

19   consider the deterrent effect of those statutes, like civil

20   rights statutes.

21            Consumer statutes exist to enforce the notions

22   of truthfulness, accuracy, honesty, and responsibility in the

23   marketing of a range of goods and services.  One of those goods

24   that is marketed under the consumer laws are prescription

25   drugs.  If prescription drugs aren't marketed truthfully,

accurately, responsibly, it's not just that people spend money that they wouldn't have spent, which was certainly the case here with the consumer class; it's that many people can be injured and can be killed.

Why?  Because -- and here it's a settlement, so these are allegations -- because of inaccuracy, omissions, misrepresentations in marketing.  So consumers and their small claims stand at a very important juncture of the protection of the health and safety of all of us.

One of our class representatives in this case, who spent maybe a few dollars for her co-pay and had a very small claim, was also a nurse.  She understood that if the consumer laws were followed by prescription drug companies, by medical device companies, by hospitals, if those laws were followed, many injuries would be prevented and many lives would be saved.

So that is an important factor here, and we appreciate that the Court recognizes that and also recognizes that if lawyers don't step up to prosecute these claims where they can't expect a percentage fee of any substance, then the claims will go unenforced.  The laws will go unenforced.  So it takes consumers as class representatives and it takes lawyers to represent them, recognizing that the percentage of recovery contingent fee tradition, as Your Honor noted, doesn't always fit.

09:44

1   That is a problem, and I don't think that the

2   courts have defined an absolute resolution for it.  Courts

3   continue to struggle with this.  They continue to consider all

4   of the factors that Your Honor mentioned this morning and all

5   of the factors that were analyzed in your previous award, which

6   we greatly appreciate.  It's a balancing act of many factors

7   and there is no one rule, but there are principles that can be

8   borrowed and combined.

9   One of them is the percentage notion.  You must

10  look at that.  The Fifth Circuit says so.  Another is the time

11  factor.  The Fifth Circuit also says look at the time the

12  lawyers spent, look at the sheer number of hours, and there

13  might be an imbalance.  There is in civil rights cases.

14  Lawyers can spend hundreds or thousands of hours to get a

15  decree, which is an important decree, but how much monetary

16  value does it have?  No one knows except it may be priceless.

17  Here we think enforcing the consumer laws and

18  protecting consumers is priceless.  That doesn't give you a

19  calculator, Your Honor, to fix the just right fee.  This is

20  Goldilocks on steroids, quite frankly.

21  If you were to ask any of us around the table

22  what would be the perfect fee in this case, we couldn't tell

23  you.  Number 1, we are not disinterested.  Number 2, we see it

24  from our perspective.  Number 3, we know the amount of time

25  that was spent over the years.  But who are we to judge?  We

1   are not the judge.

2            So this is a very long-winded way of saying

3   thank you.  We appreciate your analysis.  We appreciate your

4   understanding of the issues and the factors here.  We would

5   greatly appreciate the reinstatement of an award so that, as a

6   fee committee, we can take our next step and make a

7   recommendation about how to pay the lawyers that contributed to

8   the consumer claims some small part of the time they spent.

9            We understand no one is going to get paid for

10  all the time they spent.  It can't be done here.  There was a

11  lot of time spent over many years.  Some people -- and I know

12  this because I assigned the work in the MDL, for the MDL

13  portion of this, as the consumer chair.  Some people were much

14  better at actually doing the work than keeping their time, and

15  so that's a problem that we have to grapple with now.

16           I would say to Your Honor, as you are

17  reconsidering this, yes, consider the sheer amount of time that

18  was spent.  Consider that, as a percentage award, this may seem

19  unbalanced.  It may seem that the lawyers are receiving more

20  than the claimants did, but we did everything we possibly could

21  to maximize the claims rate here.  We appreciate that you don't

22  have to make a claim as a consumer for your $50 or your $75 to

23  both depend on what consumer class actions do or to appreciate

24  them, and we believe we do have the appreciation of the class

25  in this case.

09:47

1          Beyond that, this is a qualitative analysis, and
2   we leave it to the Court with our thanks.
3          **THE COURT:**  Thank you, Elizabeth.
4          Ann, do you have something to say?
5          **MS. OLDFATHER:**  Yes, I do.  Thank you, Your Honor.
6   Ann Oldfather.
7          Of all the people here, I might be the least
8   interested.  I am interested.  Elizabeth pointed out that all
9   of us are not disinterested, but my time that I have put in on
10  the consumer class has been very clearly delineated as work I
11  did over here in the MDL general that at least I think should
12  be considered as benefiting the consumer class.  I want to set
13  that aside for right now because I don't want to argue that
14  point.
15         I instead want to direct a few short comments to
16  the Court's immediate concerns, particularly the question about
17  how do we feel about the original attorneys' award that
18  Your Honor made of the $4,025,000 was four times the recovery
19  of persons that came in and submitted claims.  I want to echo
20  very strongly what Ms. Cabraser has just said about the policy
21  of the law and the deterrence of the consumer litigation and
22  the consumer statutes that are out there.
23         Coincidentally, I am from Kentucky, where the
24  majority of actual litigation was done by Mr. Getty in this
25  case.  Just as an aside, I have an understanding that when he

09:49

1   came into the litigation, there was some talk about his fee
2   being $2.5 million based on the knowledge of the work that he
3   had done at that time.  That's hard work even though it's not
4   trial work.  It's trips up to the courts of appeal, Your Honor,
5   which as you say might not be the search for truth, but
6   certainly is trying to defend what the trial court did.

7           I'm here as a lawyer that primarily does one-off
8   litigation.  I do the civil rights actions.  I do the consumer
9   work.  I know that the relationship between the importance of
10  that case to the client and the amount of time that has to be
11  expended in advocacy is not tied together in any measurable
12  way, which is why the courts have the authority to set the fee.
13  They are not limited in any of that litigation, under Kentucky
14  state law, to the amount of the recovery.  It's a factor.
15  That's all it is.

16          Here Your Honor has laid out the best case to
17  de-correlate the recovery from the attorneys' fee.  The
18  inability of the whole process to deal with everything at once
19  and the need for prioritization has, as Your Honor recognized
20  here today and as is in your opinion, necessarily resulted in a
21  lower recovery.  Necessarily.  Lack of prioritization equals
22  lower recovery.  Lack of prioritization does not equal less
23  work.

24          The amount of work these attorneys still had to
25  do, that Mr. Getty still had to do, that class counsel still

09:51

1   had to do was not diminished at all in any way, shape, or form.

2   Merck did not fight it less.  So just the pure fact of the

3   de-correlation between the recovery and then the amount of work

4   over the passage of time means, Your Honor, to the extent that

5   you are looking at this from a contingent fee approach, it is

6   simply not fair.  The "not fair" happens to these people that

7   had to do the same amount of work in order to benefit the

8   persons who chose not to come in and submit a fee.

9             They developed that right.  They negotiated that

10  settlement.  They did and -- to any extent that I did -- we did

11  the work that from Merck's perspective said, "We might owe as

12  much as $23 million," and from Merck's perspective a $7 million

13  fee is within the realm of fairness.

14            When Your Honor grappled with these issues

15  already and came up with the $4,025,000 award, I have to say

16  that I might have missed it and I might have forgotten, but I

17  don't remember any objection that it was too much.  Your Honor

18  looked at the 9,000-and-odd hours and said that equates to $406

19  an hour, which is less that the $443 an hour that the 6 1/2

20  percent equated to, but you had a reasonable rationale and you

21  presented that.  I don't think anybody objected to that at all.

22       THE COURT:  Well, Merck seems to have objected now,

23  as I understand it.  They take the position that the lawyers

24  are getting more than clients.  In fact, that's what they have

25  even reported to Congress, I think.  "This particular case, it

09:53

1    goes to show that the claimant lawyers are always overreaching

2    and they get more than their litigants.  They should get a

3    contingent fee, and the contingent ought to be based solely on

4    the amount recovered."  That's at least what Congress is being

5    told, in any event.

6              **MS. OLDFATHER:**  It's hard for me to understand that,

7    Your Honor, when there has been an unlimited bucket, basically,

8    available to all of the persons who wanted to come in here and

9    submit their claims, the plaintiffs, those injured persons.

10   Nothing is being taken out of their pocket.  So I think that

11   with a full understanding of all of the issues Your Honor

12   grappled with, it leads us to where we were in November.

13              In November, when you were dealing with

14   objections, they were objections about the fact that -- you

15   discussed 9,000 hours.  The Court became aware of the fact that

16   there were additional hours submitted by affidavit by Cabraser,

17   HHK, Barrios, and me claiming that approximately half of my

18   4,000 approved hours were directly related to *Daubert* work and

19   database work, which again I'm not going to argue that right

20   now.  I will leave that for later.  When Your Honor heard that

21   there was roughly 40 percent more hours than you had taken into

22   account, you vacated the award.

23              So you grappled with these issues, and what you

24   have before you now is you have documented, Garrett-approved,

25   more time.  If my time isn't included, if there's a decision

09:54

1   made that I wasn't assigned this work by Ms. Cabraser --

2   because I wasn't, I was assigned this work by Your Honor, the

3   work that I did -- and I don't belong over here in the consumer

4   class, all of this time belongs over here in *Vioxx* MDL, I'm not

5   going to object to that.  I just want to present it.  I want to

6   present it because I know that Merck committed to up to

7   $7 million in fees.  I think the more we have available for all

8   the hard work that was done in this MDL, the better it is.

9            So the way I see this, Your Honor, is the

10  foundation question is does the 2,000 hours that I did in that

11  context get counted for the total.  If not, then the total goes

12  down from 14,000 to 12,000.  Then you have 12,000 total hours

13  compared to the 9,000 that you had before, and does that

14  justify more than the $4 million?  Even if I'm not in there,

15  I'm an advocate for the fact it has to.  That work was done,

16  and there wasn't anything cheaper about it.

17           Thank you, Your Honor.  I'm going to reserve my

18  other comments and the other reasons I'm here today for when we

19  get to that part.

20           **THE COURT:**  Okay.  Thank you.

21           **MS. OLDFATHER:**  Thank you.

22           **THE COURT:**  For those of you who are not familiar

23  with the process that I usually use in this case -- and I have

24  written on it and published several articles on it.  In any

25  event, what I try to do in these cases is, first of all, I

09:56

1    focus on the size of the pie, as I mentioned.  In the size of

2    the pie, I try to figure out the work done, the amount

3    recovered, how it plays out with other cases, and make some

4    sense out of it that gives me a logical position to justify the

5    size of the pie.  After that is finished, then I focus

6    everybody's attention on the slices of the pie.  I really

7    believe in that aspect of the case I need as much information

8    as I can get.

9            I have, as you all know, appointed early on a

10   CPA, Mr. Garrett, who keeps a monthly report on the amount of

11   time logged in the case, and I meet with him monthly.  We go

12   over the amount.  He prepares for me a monthly accounting of

13   the work done on the case, who does it, what they do; and not

14   only the time log, but what was done for the time.  We all know

15   that monitoring the case is important, but that time is not as

16   important as trial time or deposition time or argument time or

17   appeal time or brief time, that sort of thing.  So I always

18   look at not only the time, but what was done with the time.  I

19   do that on a monthly basis.  At the end of the case, he

20   prepares for me a summary of all those months and I have that

21   information.

22           Then I generally appoint a fee allocation

23   committee of the people whom I know over the years of the

24   litigation because I've watched the litigation.  I do my own

25   discovery.  I do work with the CPA.  I know who is doing the

09:58

1    work because I get that monthly and I see who is putting in the
2    time, what they are doing with it, how much money they have
3    invested in it, and so forth.

4              So I pick those individuals, whether they are on
5    the committee or not on the committee, and I appoint them to a
6    fee allocation committee.  Those are the people that I know.
7    Maybe there are other people who are doing the work too, but I
8    know that these individuals are doing the work.  I think that
9    it's an insider view, and I want the insider's approach.

10             They give it to me, and then I appoint generally
11   a special master, who is an outsider.  He doesn't know anything
12   about the work being done on it, hasn't participated in the
13   work, knows a bit about the case, but doesn't have any dog in
14   that fight.  That individual then gives me input.

15             So at that time I have the insider's input, an
16   outsider view of it, and the material that I have gathered from
17   the CPA -- who, by the way, always has on his staff a paralegal
18   who can screen the material and see whether or not the time
19   spent is appropriate for that particular project.  So it's
20   washed time, that is to say, it's valid time.  It's not just
21   made-up time.  So I have all of that information, and then I
22   look at it and I make a decision as to the slice of the pie.
23   Here we are dealing with the size of the pie, not the slice.

24             I'll hear from anybody in the audience, and then
25   I will hear from the people on the phone if they have any

09:59    1    comments.

2              **MR. JOHNSON:**  Good morning, Your Honor.  I'll heed

3    your results and note that -- I'm sorry.  Dennis Johnson from

4    Johnson & Perkinson in Vermont.

5              I'll note that the majority of my submission

6    pertained to the size of the slices, not to the size of the

7    pie.  I think some of the problem that I had in responding to

8    your order is that it's been very difficult to get information

9    because the fee committee is relying on your confidentiality

10   provision of Rule 59(a) to basically say, "We can't discuss

11   what other people have done, what we are thinking."  It seems

12   like perhaps this all might avoid bringing things to your

13   attention if there were freer communication.

14             I have written various letters.  They go

15   unresponded to.  If there's some way to maybe allow me to

16   access them without that provision -- which I believe was

17   written primarily to prevent public disclosure, to prevent

18   defendants from coming after the thought processes of the fee

19   committee -- that's my first request, and then I have two

20   comments.

21             Let me just note, in terms of supporting that

22   request, the MDL litigation was a very collaborative

23   litigation.  Our firm worked very closely with four firms:  the

24   Barrios firm, the Cabraser firm, Keller Rohrback, and the

25   Herman firm.  We were involved, as I pointed out in my brief,

10:01

1   in virtually most of the substantive litigation.

2          We did not appear at the hearings, so we are not

3   one of those people who you identified as being involved with a

4   basis of knowledge to make the determination on slicing the pie

5   once the pie was set, but we were there.  We could have been.

6   It seems appropriate that maybe our firm, at least, be allowed

7   to discuss with these folks a little more freely than they are

8   interpreting your order.

9          Secondly, I'm not involved in arguments about

10   the big pie, but I will note two things.

11          One, the *Boeing* case seems to be very relevant

12   here.  The award is based upon the size that's available of the

13   fund, not the size that's claimed.  I'm sure that Merck can

14   figure out a hundred ways to say, "Oh, that's very

15   distinguishable because here it's 400 times.  That's not what

16   they were dealing with there."  Nonetheless, those are the

17   words.  They seem to be particularly apropos.

18          The other thing that I will note -- and I don't

19   know if people have talked about this -- many of the state laws

20   that were involved in this case actually have statutory

21   provisions saying if you prevail you shall collect your fees.

22   It's not you shall collect your fees up to a certain

23   percentage.  It's, rather, the prevailing plaintiffs' attorney,

24   if they prevail, is entitled to fees.

25          Now, I understand you could argue, "Well, you

10:02

1    didn't prevail," but we did.  We got a settlement.  We got a

2    settlement in all the states.  So that's a separate and

3    independent basis to say that whatever the award may be --

4    whether it's the full amount or the amount from before or

5    something in between -- can be justified, I think, on two

6    separate, independent bases.

7                    I'll save the rest of this hopefully to talk to

8    them, maybe resolve some of the questions I have raised, and

9    hopefully not bother you again with them.

10              **THE COURT:**  I appreciate you being here.

11              **MR. HERMAN:**  I have some brief remarks on behalf of

12    the fee committee.

13              **THE COURT:**  Anything from you, sir?

14              **MR. HERMAN:**  Mr. Lyle?

15              **MR. LYLE:**  No, Your Honor.

16              **THE COURT:**  I appreciate you being here, Mr. Lyle.

17              **MR. LYLE:**  Thank you.

18              **THE COURT:**  Russ, let me hear from you.

19              **MR. HERMAN:**  I'm going to be as brief as I can, but I

20    do want to --

21              **THE COURT:**  Give me your thoughts about the fact

22    that -- maybe we have talked about it enough, but your thoughts

23    about the fact that the attorneys are getting more than the

24    claimants.  How do you feel about that in consumer matters?

25              **MR. HERMAN:**  May it please the Court.  I have always

10:03

1    looked at the *Johnson* factors as a guide.  How difficult are
2    the purchase claims cases?  They are extraordinarily difficult
3    for a number of reasons.  They come at the tail end.
4    Your Honor has explored that.  They are also extremely
5    difficult because various courts, Your Honor, have
6    determined -- particularly in the federal system -- that the
7    claims are not compensable for one reason or another.

8              Fundamentally, I believe that it's a poor man's
9    opportunity to justice, and that takes a much greater resource
10   and intellectual effort.  I say that because class actions
11   originally, in my view, come from John Stuart Mill and Jeremy
12   Bentham, that say you do the greatest good for the greatest
13   number, and folks with small claims were not able to get
14   attorneys.  So, therefore, that was at least an underlying
15   principle for the legislation that enabled class actions, which
16   somehow academically in some ways has been eroded.

17             The MDLs were created for a different reason,
18   and that reason was how do we establish and have a process for
19   multiple judges burdened not only with cases that are more than
20   similar, but how do we create a system -- at least in
21   discovery -- in which there is an opportunity to aggregate
22   those cases before one qualified judge for determination.

23             I'm not disregarding a motivation to treat each
24   side with due process, but the motivation had to do primarily
25   with the judicial oversight of multiple cases, and there's a

1    reason for that.  When Bentham and Mill were writing, at the

2    same time as Dickens, there was a change in technology.  There

3    was an industrial revolution.  Instead of having one individual

4    aggrieved against a business, for example, you had a

5    multiplicity.

6                   Then we entered a technological age where, as

7    Ms. Cabraser introduced, you have a situation where a corporate

8    conduct in a technological age, where you are producing

9    millions and millions of products, has the capacity to damage

10   millions and millions of individuals.  That is one of the

11   motivating reasons, I believe, that underline the judiciary's

12   determination not only to do the greatest good for the greatest

13   number, but to have a judicial system.

14                  So it makes these cases very difficult because,

15   from the lawyers' point of view, the purchase claim consumer

16   has an absolute right to be compensated, but the impediments to

17   that, the difficulties to that -- I can use Mr. Getty for

18   example.  No, the case wasn't tried, there were no depositions

19   taken, but he fought for any number of years to get a group of

20   individuals who had been harmed and who had claims compensated.

21   His case was pending in Kentucky's state supreme court at the

22   time the matter was settled.

23                  Mr. Lyle makes a contribution that's

24   immeasurable.  He comes into the case and he says, "We have

25   Hispanics and the notice is in English."  He makes other

1    contributions to the notice, which actually improved notice

2    over time because of the various modalities which are more

3    modern than what's traditionally been used.

4                    Ms. Cabraser has an extraordinary burden.  She

5    is appointed as the purchase claims chairman in the MDL.  She

6    is supervising these claims all over the country.  I don't

7    think you can measure the time that that takes, the resources.

8                    Ms. Barrios has, as usual, done an excellent job

9    as state liaison.  We don't even find out what cases are

10   pending unless Ms. Barrios on a daily basis is in contact with

11   a multitude of law firms by stage.  How do you measure that?

12                   We are firms that don't have a thousand lawyers.

13   We are firms that do not have the capacity to hire lawyers at a

14   thousand dollars an hour.  So the difficulty, the charge on our

15   time and resources, is manifold.

16                   I understand the academic debate.  I am not

17   challenging the courts of appeal, but we have -- may it please

18   the Court and with due respect -- academics who have never

19   tried an individual case, who have never been lead or liaison

20   in a technological case, whether it's pharmaceutical or some

21   other defect, whether it's automobiles or something else, who

22   do not have in my view -- they are entitled to their academic

23   view, but when they argue that these lawyers in this courtroom

24   and others who undertake to represent underprivileged

25   individuals with their time and their resources to achieve a

10:11

1   justice -- I believe that a fee, a multiple fee for their

2   efforts, without regard to the *Johnson* factors, is entitled.

3   Thank you, Your Honor.

4             **THE COURT:**  Thank you.

5                     Anything from anyone on the phone?

6             **MR. GETTY:**  Yes, sir.  Richard Getty.

7             **THE COURT:**  Go ahead, Mr. Getty.

8             **MR. GETTY:**  First of all, Your Honor, let me say that

9   it has certainly been a great honor to have been able to appear

10  in front of you, to learn from observing you, and to have

11  served on the fee committee.

12                    I can understand the quandary that the Court is

13  in given the submission of these additional hours, which I'm

14  not sure the Court anticipated.  Looking back at what happened

15  here, from my point of view and a number of other firms, Merck

16  proved itself to be a very stubborn adversary in a number of

17  these cases.  They fought very hard.  They were well-lawyered,

18  well-represented.  My own firm spent 10 years plus litigating

19  with Merck from one end to the other.  In the end, after

20  waiting seven months to get a ruling, we agreed to participate

21  in the MDL, which I believe significantly allowed the MDL

22  settlement to occur.

23                    In looking at this, I think the Court has to

24  consider what's fair under the circumstances.  There was some

25  reluctance at the outset within the committee to pursue an

1  aggregate fee petition.  I'm proud to say that I was one of the

2  proponents of doing that.  With some assistance from others in

3  my firm, we prepared the aggregate fee petition, which was

4  successful and resulted in your earlier ruling.

5          The Court is faced here with the circumstance

6  where most of these states do have statutory provisions for fee

7  awards.  In fact, I believe Jim Lyle and I submitted a

8  memorandum, which I believe was presented to the Court through

9  the fee committee, outlining the number of different

10 jurisdictions that address statutory fees.

11          The goal here should be, overall, to be fair in

12 recognizing the various contributions that the various

13 attorneys, various firms have made here.  It would be unfair,

14 in my opinion, to exclude the additional hours.  They were

15 submitted late, but nonetheless they represent hours that these

16 firms labored in the MDL or dealing with Merck.  I believe that

17 the Court should consider some increase in the pie that is

18 available to everyone.

19          I think the Court at this point should be aware

20 of the amounts of contributions made by the various firms not

21 just in terms of hours, but also the substantive commitments

22 and contributions that were made in bringing about the result

23 that was achieved here.  So I would be a proponent for the

24 Court giving careful consideration to some increase which the

25 Court, in its wisdom, feels would be appropriate given these

1    additional hours.  I think, otherwise, to consider those hours

2    and not increase the amount would be unfair to everyone.  So I

3    would be in favor of that.

4           I would echo the words of Elizabeth, which I

5    thought were very eloquent, and also Russ, which were equally

6    eloquent, about what we do in these kinds of cases to try and

7    seek justice.  It's not only a commitment of hours in

8    depositions, arguing motions, etc., and/or in trial in certain

9    cases, but it's a commitment of vast resources, and most of our

10   firms are small.  They are not Scadden Arps.  They are not

11   Williams & Connolly.  We are all small firms who all have

12   worked hard on behalf of these consumers adverse to Merck, and

13   I feel certain that the Court will recognize that in the end.

14           Again, Your Honor, I'm proud to have been able

15   to serve on the committee.  It was a great honor to me.  Thank

16   you for allowing me that opportunity.

17        **THE COURT:**  Richard, give me your thoughts before you

18   leave.  The argument that no trials have occurred here, what's

19   your view of that, what work involved -- other than the notice

20   and contacting clients -- how do you see that?

21        **MR. GETTY:**  Well, I think that the number of years

22   that these cases went on fighting with Merck, the fact that

23   there were no trials, I don't think it should be that

24   meaningful in the overall context.  We spent ten years.  We did

25   multiple depositions.  They filed, I think, two or three

10:17

1   motions to mandamus the trial court after he certified the

2   case.

3              I agreed to settle, which I believe contributed

4   to allowing the MDL settlement to occur, because I couldn't

5   wait any longer than seven months with no ruling from the

6   supreme court.  I think that kind of work, those kind of

7   contributions, are equally valuable.

8              The pressure that was kept on Merck in the

9   various proceedings and the risk that existed to Merck brought

10   about this settlement.  Merck took the position that unless

11   every state in the union was included, there wasn't going to be

12   a settlement.

13              They had significant risk in Kentucky should the

14   court have reinstated the certification, which I believe they

15   were going to do, but we couldn't wait.  So I don't think the

16   absence of trial -- I think the more important factor is what

17   kind of pressure was put in these various proceedings, both in

18   the MDL and in these other cases, where Merck was exposed to

19   some degree of risk, but they finally came around and said,

20   "Okay.  We will settle, and we will provide this much money."

21              I think it's unfair to all the firms, all the

22   lawyers that worked so hard, for Merck to get one cent of what

23   they agreed should be a reasonable fee back under these

24   circumstances.  The Court may feel that all $7 million is not

25   warranted here, perhaps some percentage of it, perhaps all of

10:19

1  the $7 million.  That's the decision that the Court will make.

2  The Court may feel that what it has awarded now is sufficient.

3  I believe some consideration should be given to an additional

4  amount, and I think the Court should give serious consideration

5  to the pressure and risk, absent any trial, that was put on

6  Merck.

7             **THE COURT:**  Okay.  Thank you.

8             **MR. GETTY:**  I hope I have answered your question.

9             **MR. MASON:**  Your Honor, this is Gary Mason.  Can you

10  hear me?

11             **THE COURT:**  Sure, I can hear you.

12             **MR. MASON:**  Yes.  Thank you, Your Honor.  This is

13  Gary Mason of Whitfield Bryson & Mason.  I just wanted to take

14  a minute or two of your time to introduce ourselves, really.

15  Myself, my colleagues, and our *Vioxx* case have had very little

16  visibility in the MDL.  We filed a class action 14 years, in

17  2004, like everyone else on this call, and ours is one of a

18  handful of cases that was removed and then subsequently

19  remanded.

20             We had the opportunity to litigate that case for

21  all of these years until settlement, on a similar path to

22  Mr. Getty and others.  We did substantial work in the case, as

23  the documents before you will indicate.  We proceeded through

24  discovery.  We developed an expert report, an economic loss,

25  and filed our class cert motion, which was pending at the time

10:21   1    of settlement.

2                    Very similar to Mr. Getty, we agreed to settle.

3    That was our understanding of what was required to get a

4    national settlement that was beneficial to the entire class.

5    We decided that that was the right thing to do and threw

6    ourselves into that settlement and into this MDL.

7                    So, Your Honor, we think that our case also

8    represented a substantial threat to Merck.  The Missouri case

9    that preceded us was certified and, I believe, led to a

10   $200 million settlement.  Mr. Getty's case was proceeding

11   towards a possible recertification, and ours was on that track.

12   I think the state court cases had some significant leverage to

13   getting the deal done that ultimately was done, and our

14   participation seemed to be of significance.

15                   Like everyone else on this call, Your Honor,

16   substantial time was put in.  I have seen some charts that were

17   circulated that suggest that the vast majority if not all of

18   the lodestar out there should be paid for, should be

19   compensated for without a tremendous increase in what the Court

20   has already awarded.  Based on everything I have heard on this

21   call and the review I have done of everyone's submission, it

22   seems that the excellent work that's been done by all parties

23   deserves to be compensated.

24                   I thank you, Your Honor, for your consideration

25   in this complex and prolonged case.

1          **THE COURT:**   Thank you.

2                     Anyone else?   Elizabeth, do you have a comment?

3          **MS. CABRASER:**   Yes, Your Honor, very briefly.   What

4    has been said by Mr. Getty and Mr. Mason reminded us of

5    something that we forget because we have been living this case

6    since 2004, and that is that historically the *Vioxx* consumer

7    settlement class action is unique.   We aren't ever going to see

8    it again because this was really the last national settlement

9    class that was comprised of cases that were filed as class

10   actions in the state courts right before the Class Action

11   Fairness Act became enacted in February 2005.

12                    I believe the state court in New Jersey remarked

13   upon that fact in certifying the related medical monitoring

14   class claims.   Those claims went up to the New Jersey supreme

15   court.   I remember it now because I argued it unsuccessfully in

16   the New Jersey state court.

17                    So there were consumer claims in California.

18   There were consumer and medical monitoring claims -- claims by

19   the same people not as consumers, but as people that might need

20   monitoring -- in New Jersey.   They were in Indiana.   They were

21   in Kentucky.   They could not be unified for prosecution in this

22   MDL except insofar as circumstances allowed.

23                    So we have a situation where many lawyers in

24   many places did work -- in part in parallel -- that they would

25   neither have the obligation to do nor the opportunity to do

10:24

1    today.  Today consumer class actions are creatures of the MDL

2    if they involve nationally advertised and marketed goods or

3    services, and the courts are able to address them through

4    certification or trial or settlement in one fell swoop.  This

5    couldn't happen here.  So of necessity much time was spent,

6    much risk was taken, many costs were incurred in bringing these

7    cases forward across the country until they could be unified

8    for settlement here.

9           So while we did not have a trial, we had motions

10   to dismiss.  We had appellate practice in state courts.  We had

11   three rounds of motion practice before Your Honor, first in

12   February of 2006 when the original purchase claims master

13   complaint was challenged on dismissal and it survived.  We had

14   another round where Merck moved to strike the class

15   allegations, attacked the amended consumer class action

16   complaint, brought the Washington, D.C., consumer case into

17   this Court.

18          Your Honor remembers those multiple rounds of

19   briefing and hearing as we fought to keep those consumer claims

20   alive so that they were viable for trial, so that they were

21   viable for class certification for litigation purposes.  So

22   through the auspices of this Court in enabling us to make those

23   arguments, to take that discovery, to keep the claims alive so

24   that they had to be settled, so that that was the only way to

25   solve the problem nationally -- it couldn't have been solved by

10:26

1    trying a case in this state or a case in the other state,
2    although cases got close.  It had to be solved here.  So I
3    think that's a unique consideration when you think about
4    proportionality of the fees to the importance of the claims at
5    issue as well as to the claims that were paid.
6            I think the other thing that's been hiding in
7    plain sight is the concept of proportionality, which the
8    federal rules committee has now embodied anew in the discovery
9    rules.  Proportionality doesn't just mean how much did the
10   claimants get versus how much did the lawyers get.  That will
11   work in a contingent fee case for a personal injury or a
12   wrongful death pretty much any time, and that's why the courts
13   use it.
14           When courts use percentage of the fund or
15   percentage of the recovery in class action, they are looking at
16   securities cases or antitrust cases or even personal injury
17   class action settlements where that makes sense.  I think when
18   you look at consumer claims, particularly under the unique
19   circumstances of this case, you do have to look at what the
20   legislatures looked at when they enacted these statutes and
21   provided for fees, and that what we are battling for can't
22   always be reduced to dollars and cents.  Thank you very much,
23   Your Honor.
24           **THE COURT:**  Thank you very much.
25           **MS. OLDFATHER:**  Judge, you are looking for work if it

1   wasn't trial.  I can offer you some specifically.

2              First, I will offer the work that's already been

3   compensated, and that's the work that the PSC did that led up

4   to the master settlement because that established that Vioxx

5   was defective for purposes of heart attack and stroke, half of

6   the body.  It was on that foundation, of course, that part of

7   the consumer recovery rests.

8              The other part of the foundation is the Court's

9   ruling on general causation, that that had also been shown with

10  regard to the venous side of the body, the work that our PSC,

11  if you want to call it that, took on.  That was the other leg.

12             So you have two legs on which this whole

13  recovery is based.  One leg has been compensated already at the

14  $443 an hour.  The other leg hasn't.  Those are the 2,202 hours

15  that I carved out, which either will or will not get considered

16  here or over in the *Vioxx* MDL when we get to that.

17             If they are considered here, then any detractors

18  can be pointed to that work, that work establishing general

19  causation, which was dealing with Merck's best experts that

20  they could pick about how Vioxx had nothing to do with venous

21  injuries.  Taking those depositions, developing epidemiologic

22  proof, looking at all of the clinical studies, paying a ton of

23  money taking those depositions across the country, and then

24  coming in here for a full day's *Daubert* hearing, I would rather

25  have a jury trial any day.

10:29

1          So, Your Honor, there is no question about the

2    quality, the content of the work.  If we are going to talk

3    about proportionality, as Ms. Cabraser suggests, the

4    proportionality we should be looking at is not the

5    proportionality of the number of people who were left with

6    adequate proof and adequate interest to come in and submit

7    their claims.  It's the proportionality of the size of the fund

8    that was available for people to do that.  Thank you,

9    Your Honor.

10          **THE COURT:**  Thank you very much.

11          **MR. HERMAN:**  Your Honor, I have one request.

12          **THE COURT:**  Yes.

13          **MR. HERMAN:**  I know this has lasted longer than

14    perhaps any others.

15          The various firms that have spoken about the

16    amount of the work done, I have two banker boxes filled with

17    the supporting material that was submitted to the fee

18    committee.  If Your Honor finds that will be helpful in what

19    you are contemplating now -- usually it's sacrosanct to the fee

20    committee -- we can make that available.

21          **THE COURT:**  Thank you very much.

22          Thank you everybody.  I appreciate it.  Court

23    will stand in recess.

24          **THE DEPUTY CLERK:**  All rise.

25          (Proceedings adjourned.)

1        **<u>CERTIFICATE</u>**

2              I, Toni Doyle Tusa, CCR, FCRR, Official Court

3     Reporter for the United States District Court, Eastern District

4     of Louisiana, certify that the foregoing is a true and correct

5     transcript, to the best of my ability and understanding, from

6     the record of proceedings in the above-entitled matter.

7

8

9                                   */s/ Toni Doyle Tusa*
                                  Toni Doyle Tusa, CCR, FCRR
10                                 Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25